Argued and submitted February 11, affirmed April 27, 1982

## A-1 SANDBLASTING &
## STEAMCLEANING CO., INC.,
*Respondent on review,*
*v.*
## BAIDEN et al,
*Petitioners on review.*

## (SC 28131, CA 17975, TC A7902-00834)
643 P2d 1260

Robert E. Franz, Jr., Eugene, argued the cause and filed brief for petitioners on review.

Charles R. Mowry, Portland, argued the cause and filed brief for respondent on review. With him on the brief was Dardano, Mowry, Weidner & Griffiths, P.C., Portland.

LINDE, J.

**LINDE, J.**

Plaintiff, a contractor in the business of cleaning and painting large structures, sued its liability insurer to recover sums that plaintiff had paid to the owners of automobiles damaged by plaintiff in the course of spray painting a bridge. The insurer defended on the grounds that coverage was excluded, first, by a clause in the policy and second, by a public policy against recovering insurance for liability arising from intentional conduct. The trial court entered summary judgment for defendant on the basis of the policy exclusion. The Court of Appeals reversed, holding that the exclusion required clarification by evidence and that coverage, if provided by the insurance policy, was not precluded by the nature of plaintiff's conduct. 53 Or App 890, 632 P2d 1377 (1981). Having allowed review primarily to consider the second issue, we affirm.

The Court of Appeals summarized the facts as follows:

> "In September, 1977, plaintiff purchased a broad form property damage liability insurance policy from the defendants. In May, 1978, plaintiff was awarded a contract with the State of Oregon to paint the McCollough Bridge in Coos County. Under the terms of the contract with the State, plaintiff could paint the bridge by brush, roller or spray. The contract also required plaintiff to make arrangements for the removal of overspray from passing vehicles. Despite plaintiff's efforts to avoid overspray damage, a large number of vehicles passing over the bridge were sprayed. In accordance with its contract, plaintiff established a paint removal service near the bridge. Not all drivers took advantage of the service, and some of those who did were unsatisfied. The affidavit of plaintiff's owner asserts that precautions to avoid overspray were taken, but that despite any precautions taken in such a spray paint operation, overspray in undeterminable amounts is inevitable."

53 Or App at 892.

The clause relied on by defendant as excluding coverage provides:

> "This insurance does not cover liability
>
> "* * * * *

"(h) For damage to property arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

53 Or App at 892-93. The parties dispute whether the list of acids, alkalis, liquids, and other substances mentioned in this clause includes the paint sprayed by plaintiff that gave rise to the claims against it. The Court of Appeals concluded that this reading of the clause is not "so clear as to cause a reasonable person in the position of the insured to believe that paint was one of the substances referred to" in the exclusion and that the clause plausibly might be read to exclude liability for pollution damages to the environment. In view of an affidavit that defendants knew of the sandblasting and painting operations for which plaintiff wished liability insurance, the meaning intended or understood by the parties to the policy should be determined upon trial. 53 Or App 894-96. We agree with this conclusion of the Court of Appeals.

■      The case nevertheless would not need to be remanded for trial if the harmful conduct for which plaintiff became liable precludes recovery under a general principle disallowing indemnity against liability for intentional wrongdoing. In the law of liability insurance, this general principle is variously based on specific policy provisions, or on "the very nature of insurance," or on public policy. *See* Keeton, Insurance Law 288-289 (1971). Because such insurance contracts traditionally covered liability arising from "accidents" or expressly excluded liability for intentional acts, most decisions denying recovery have not had to go beyond the limits explicit or implicit in the contract and squarely to hold insurance covering liability for intentional acts to be an unlawful contract. There may be a question how far the case law interpreting older policies was superseded, intentionally or otherwise, by the 1966 change in a new standard liability policy, which substituted the term "occurrence" for "accident" in the key coverage clause (though retaining "accident" as part of the definition of

"occurrence" at least for some purposes).[1] The insurance contract found in the present record, however, consists primarily of typewritten provisions of a policy issued by defendant underwriters at Lloyd's, London, which refer neither to "accidents" nor to the legal premise of the liability against which the policy protects the insured. If any policy provisions or prior interpretations of similar insurance policies exclude coverage of this insured's operations, other than the exclusion previously referred to, defendants have not cited them. We therefore turn to the question whether Oregon law precludes recovery if the losses resulting from those operations otherwise were within the coverage of the insurance contract.

Defendants contend that recovery is precluded insofar as the insured intentionally chose a method of operation, spray painting, which the insured fully expected to cause the harm for which it paid and now seeks reimbursement. "Intent," in this as in other contexts, is a term of many meanings, which is applied to mental states extending from conscious performance of the simplest bodily acts to the widest ultimate expectations. In a provision restricting insurance against liability for intentional wrongdoing, "intentional" could refer to any liability pleaded as one of the intentional torts, or irrespective of the theory of liability, to an insured's intentional action which unintentionally causes harm, or to such intentional action only when taken in disregard of a certainty or high likelihood of harm, or to actions motivated by a purpose to cause harm, though not necessarily the actual harm suffered by the injured party, or finally only to action taken for the purpose of inflicting the very harm for which liability is later imposed. Courts have reached different positions on these meanings of intent when construing clauses excluding intended harm from insurance coverage. *See Pachucki v. Republic Ins. Co.,* 89 Wis 703, 708, 278 NW2d 898, 901 (1979), citing Annot., 2 ALR 3d 1238 (1965). This court interpreted one such exclusion to apply only when the harm itself was intended in *City of Burns v.*

---

[1] This and related questions concerning liability insurance for predictable or unavoidable harm from construction work are helpfully reviewed in Hall, *Contractors' Liability Insurance for Property Damage Incidental to Normal Operations— The Standard Coverage Problem,* 16 U Kan L Rev 181 (1968).

*Northwestern Mutual Ins. Co.,* 248 Or 364, 434 P2d 465 (1967). Two later decisions similarly interpreted contract clauses, *Snyder v. Nelson/Leatherby Ins. Co.,* 278 Or 409, 564 P2d 681 (1977) (policy limited to losses "caused by accident"); *Nielsen v. St. Paul Companies,* 283 Or 277, 583 P2d 545 (1978) (exclusion of losses "expected or intended from the standpoint of the Insured"). Professor (now Judge) Keeton maintained that the concept of insurance necessarily implies an exclusion of "intentional" losses, as seen from the standpoint of the person whose loss is the basis of the insurance claim, conceding that to include "highly expectable" losses under this rubric states a difficult distinction of degree. Keeton, Insurance Law 286-90, 297-99 (1971).

As we have said, the question how far an insurance policy in the form employed in this case is understood or interpreted to imply such an exclusion has not been briefed. If coverage is to be precluded as a matter of law, however, the rule must be sought not in the meaning of "intent" but in some public policy overriding normal contractual obligations.

Such a public policy may be found in legislative enactments, administrative regulations, even in the constitution, *see Hendrix v. McKee,* 281 Or 123, 132, 575 P2d 134 (1978). No such source is cited to us here.[2] Occasionally, the rule may be developed in case law. *See Harrell v. Travelers Indemnity Co.,* 279 Or 199, 205-208, 567 P2d 1013 (1977), *Isenhart v. General Casualty Co.,* 233 Or 49, 377 P2d 26 (1962). Defendant argues that such a rule

---

[2] Insofar as there was a *governmental* policy in this case, it presumably was to have the bridge painted at the lowest cost while minimizing the attendant risk of harm as well as inconvenience. The contracting parties contemplated the high probability that paint would strike some vehicles and provided for facilities to clean them as well as insurance. The state did not choose to close the bridge for periods alternating with periods of painting.

The case thus illustrates the obstacles to judicial creation of "public policy" restrictions on liability insurance. The costs here at issue could be spread through insurance, reflected in the contract bid, or through the tax costs of painting by costlier methods less likely to strike cars than spray painting, or they could be left to tort claims of the hapless victims against the contractor. If liability coverage is precluded, the state might be limited to contractors large enough to be self-insurers, unless it is willing to deal with contractors that may be financially unable to satisfy uninsurable claims. Policy choices like these should have a source beyond judicial speculation.

precludes insurance against liability for injuries caused by the insured's intentional action when these injuries, though undesired, are so certain as to fall within the tort principle that one is deemed to intend the foreseen or expected consequences of one's acts. The rule is said to be required by a public policy of deterring persons from choosing to disregard known or expected harm to others because any liability for this harm will be borne by the insurer.

Although the argument of "deterrence" has superficial plausibility, this court has not found in it the basis of a "public policy" restricting liability insurance. For one thing, the argument proves too much. There is a public policy, expressed by criminal, administrative, and civil sanctions, to deter negligent and irresponsible as well as intentional misconduct, yet the argument that insurance would undermine the deterrent of liability for negligence was rejected long ago. *See* Appleman, *Insurance Law and Practice* § 2105 at 9 (Revised Ed); McNeely, *Illegality as a Factor in Liability Insurance,* 41 Colum L Rev 26 (1941). Moreover, when a court is called upon to derive a public policy from assumptions about the effect of legal rules on social behavior, it is asked to act largely on faith. A rule against insurance for highly expectable losses is a blunt instrument. Fear of uninsured liability may serve to deter irresponsible conduct in one context and not in another. In the present context of a contractor's liability for harm caused by construction or repair work, for instance, it has been suggested that other costs of injuries and claims litigation remain to deter substandard operations even under liability insurance. Hall, *Contractors' Liability Insurance for Property Damage Incidental to Normal Operations—The Standard Coverage Problem,* 16 U Kan L Rev 181, 187-91 (1968).[3] Legislators can make such policy judgments on empirical or on political grounds, but the court

---

[3] Mr. Hall, in the article cited in note 1, discusses the possibility that businessmen may be willing to risk liability for property damage from dangerous operations when they would shy away from gain at the cost of another's bodily injury, and that this willingness might be enhanced by liability insurance. He lists several countervailing factors nevertheless discouraging high-risk operations, such as possible injury to employees, disruption of operations, penalty clauses in contracts, collateral costs in claims litigation and of loss of goodwill, the risk of higher insurance premiums, and the pressure of liability insurers for safer operations. 16 U Kan L Rev 181, 187-189.

has been presented with nothing within the reach of judicial notice to show that liability insurance would have a greater "evil tendency"[4] to promote tortious or otherwise unlawful operations when it covers expected, though undesired, negligently caused injuries.

Accordingly, this court's precedents on "public policy" restrictions on insurance coverage, *Isenhart v. General Casualty Co.* and *Harrell v. Travelers Indemnity Co., supra,* have taken a different view of excluding liability for intentional wrongdoing. In *Isenhart,* the insured sued the liability insurer to recover the costs of his legal defense against an action for assault and battery, which the insurer had declined to defend under its general liability policy. The terms of the policy were not part of the record, precluding a decision based on interpretation of the contract. On the insurer's defense based on public policy, Justice O'Connell wrote for the court:

> "A contract to indemnify the insured for damages he is forced to pay as a result of an intentionally inflicted injury upon another should not be regarded as contrary to public policy unless the fact of insurance coverage can be related in some substantial way to the commission of wrongful acts of that character. Plaintiff contends that a person's

---

Hall acknowledges that liability insurance may encourage the use of low-cost, high risk methods in some operations, of which the present case may be typical. But a general rule precluding liability insurance coverage for predictable and expected losses does not differentiate situations where this effect is or is not likely. Hall continues:

> "Even if it could be established that liability insurance for property damage incidental to the contractor's normal operations would discourage utilization of safer modes of operation, it would not follow necessarily that insurance for such damage should be held to be against public policy. Deterrence is not the only objective of the tort law. Equally if not more important is the objective of compensating the injured party. . . The significance of insurance as the sole source of compensation looms particularly large in the areas of contractors' liability for property damage incidental to normal operations."

16 U Kan L Rev 181, 190. Possibly a contractor might still be denied recovery under a liability insurance policy if it is shown that the contractor deliberately chose a high-risk, cost-cutting method of operation because it had shifted the financial risk to the insurer, but such a defense would have to be found in the relations between the insurer and the insured, not in a rule forbidding the insurance.

[4] *Pyle v. Kernan,* 148 Or 666, 673, 36 P2d 580 (1934).

decision as to whether he will intentionally inflict an injury upon another will not ordinarily turn upon the existence or non-existence of insurance covering the insured's loss resulting from an action brought against him for such conduct. Generally this is probably true, although depriving insured of coverage for intentionally inflicted injuries might have such a deterring effect in some cases. However, punishment rather than deterrence is the real basis upon which coverage should be excluded. A person should suffer the financial consequences flowing from his intentional conduct and should not be reimbursed for his loss, even though he bargains for it in the form of a contract of insurance. A similar idea is expressed in the cases which exclude coverage on the ground that 'a person should not profit from his own wrong.' "

233 Or at 52-53 (footnotes omitted). Liability for assault and battery therefore was not within the coverage of the policy and of the promise to defend the insured.[5]

    In *Harrell v. Traveler's Indemnity Co., supra,* the court rejected an insurer's contention that public policy forbids liability insurance to cover punitive damages. In that case, punitive damages had been awarded against an insured who injured another by reckless driving after drinking. Quoting *Isenhart v. General Casualty Co., supra,* the court drew a distinction between the "intentional act" and "intentionally inflicted injury" for which coverage was denied in *Isenhart* and the driver's conduct in *Harrell,* even though that conduct had been found sufficiently reckless of danger to others to justify imposition of punitive damages and presumably was a serious traffic offense. *See* ORS 483.992, cited in *Harrell v. Ames,* 265 Or 183, 189, 508 P2d 211 (1973). The several opinions in *Harrell v. Traveler's Indemnity Co., supra,* make clear that the court rejected a rule denying liability coverage for the sake of deterrence and confined the rule of *Isenhart* to those intentional acts whose purpose is to cause an injury of the kind giving rise

---

[5] The court further held that the insurer had no duty to defend even against a groundless claim of damages for an intentional tort, determining the duty to defend by the allegations of the complaint against the insured. This part of the holding did not rest on public policy but on the court's assumption about the insurer's promise to defend, which presumably depends on the terms of the policy. 233 Or at 54.

to the insured's liability.[6] This limited rule was again restated with reference both to an exclusion clause and to public policy in *Nielsen v. St. Paul Companies, supra,* 283 Or at 281.

Although the insurer in this case tries to place the contractor's method of operation within the class of intentional wrongdoing, nothing in the record suggests that it was any part of the contractor's purpose to spray paint on automobiles crossing the bridge while it was being painted. To the contrary, the contractor had obligated itself to maintain cleaning facilities for just this eventuality, and its contract bid included $20,000 to cover anticipated claims. No doubt the contractor would have been pleased if no cars had crossed the bridge while the painting was in progress, but those were not the conditions provided by the state. *See supra* note 2. The choice to paint the bridge by methods and under conditions expected to cause some compensable harm was intentional, as the insurer asserts, but it was not the kind of purposeful infliction of injury that excludes recovery of indemnity under the rule of *Isenhart v. General Casualty Co.*

Affirmed.

---

[6] It is worth noting that both *Isenhart* and *Harrell* involved torts of the kind committed by individuals rather than by enterprises, and that these torts formed the context of the discussion of "punishment" or "deterrence." This does not mean that even an intentional tort by an individual may not be unintended and "fortuitous" from the standpoint of a corporation or other insured who is derivatively liable for the individual's act. *See* Keeton, Insurance Law 293 (1971). *Compare Ferguson v. Birmingham Fire Ins.,* 254 Or 496, 460 P2d 342 (1969), stating that the *Isenhart* exclusion would apply to a trespass action against an individual landowner for the acts of a laborer only if the damages arose out of the "willful" conduct of the insured. 254 Or at 506.