CITY OF MILWAUKEE and City of West Allis, Plaintiffs-Respondents and Cross-Appellants,

v.

ALLIED SMELTING CORPORATION, and Continental Insurance Company, Defendants-Appellants and Cross-Respondents,

MINERALS RECLAMATION CORPORATION, Defendant.†

Court of Appeals

*No. 82-2335. Submitted on briefs October 11, 1983.—
Decided December 7, 1983.*
(Also reported in 344 N.W.2d 523.)

---

† Petition to review denied.

378

For the defendants-appellants and cross-respondents the cause was submitted on the briefs of *Borgelt, Powell, Peterson & Frauen, S.C.,* with *Joseph D. McDevitt, M. Christine Cowles,* and *Mark A. Grady* of counsel, of Milwaukee.

For plaintiff-respondent and cross-appellant City of Milwaukee, the cause was submitted on the briefs of *James B. Brennan,* city attorney, with *Linda Uliss Burke,* assistant city attorney, of counsel, of Milwaukee.

For plaintiff-respondent and cross-appellant City of West Allis, the cause was submitted on the briefs of *Michael J. Sachen,* city attorney, with *Paul C. Hemmer,* assistant city attorney, of counsel, of West Allis.

Before Wedemeyer, P.J., Decker and Moser, JJ.

WEDEMEYER, P.J.   Continental Insurance Company (Continental) and Allied Smelting Corporation (Allied) appeal from a judgment entered December 2, 1982, following a verdict which compensated the cities of Milwaukee and West Allis (cities) for damages to their storm sewer systems caused by Allied's discharge of acid into the systems.

On appeal, Continental, separately, argues that the trial court erred in denying its motions for summary judgment and dismissal based on an exclusionary clause in the insurance policy it issued to Allied.

On appeal, Continental and Allied together argue that the trial court made the following errors: (1) directing the verdict in favor of the cities on the issues of negli-

gence and proximate cause; (2) misusing its discretion by admitting into evidence the testimony of Gary Geipel; (3) admitting into evidence exhibit No. 15 in violation of the hearsay rule; and (4) refusing to give an "absent witness" instruction, as modified to relate to photographs.

On cross-appeal, the cities claim error in the trial court's refusal to allow the jury in determining damages to consider the employee salaries for services performed in repairing the damaged sewer systems.

Because we conclude that the trial court did not err with respect to directing the verdict, ruling on the evidentiary questions and instructing the jury, we affirm the trial court's judgment regarding those issues. However, because we conclude that the exclusionary clause of the insurance policy is applicable to this case, we reverse the trial court's judgment regarding this issue. We also reverse the judgment and remand the cause for a new trial on the issue of damages because we conclude that the jury should have been allowed to consider as damages the employees' salaries.

The cities claim that Allied has, over a period of time, discharged acid into their storm sewer systems causing sufficient deterioration to require extensive repairs. On two occasions prior to trial, Continental, Allied's insurer, moved for summary judgment based on the application of an exclusionary clause to the facts of this case. Both motions were denied. At the commencement of trial, Continental moved for a dismissal of the action on the same grounds as those averred in the motions for summary judgment. This motion was also denied. At the close of all the evidence, the trial court directed a verdict on the issues of negligence and proximate cause in favor of the cities. At the same time, but to no avail, the cities asked that the jury, in determining damages, be allowed to consider the cost of salaries of employees assigned to

the sewer repair project. The jury returned a verdict of $76,574.98 in favor of the cities. In motions after verdict, Continental again moved for dismissal based on the policy exclusion. Continental and Allied moved the trial court to set aside the verdict and order a new trial. All of these motions were denied. Further facts will be discussed as are necessary during the resolution of the issues.

## EXCLUSIONARY CLAUSE

The first issue presented by this appeal is whether Continental's policy of insurance afforded Allied liability coverage from the loss caused by the discharge of acid into the cities' sewer systems. Continental contends its policy does not cover the cities' claims because the facts of this case fall within the following exclusion:

This policy does not apply:

. . . .

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.

The rules governing the construction and interpretation of an insurance policy are generally those applicable to contracts. The objective is to ascertain and carry out the true intentions of the parties. *Paper Machinery Corp. v. Nelson Foundry Co.,* 108 Wis. 2d 614, 620, 323 N.W.2d 160, 163 (Ct. App. 1982). In ascertaining the intention of the parties, a practical construction is most persuasive. *Inter-Insurance Exchange of Chicago Motor*

*Club v. Westchester Fire Insurance Co.*, 25 Wis. 2d 100, 104, 130 N.W.2d 185, 187 (1964). In construing an insurance contract, it is fundamental that no insurance contract should be rewritten so as to bind any insurer to a risk which it did not contemplate and for which it was not paid, unless the terms are ambiguous or obscure. *Id.* at 104, 130 N.W.2d at 188. In the event of ambiguity or obscurity, the language is to be construed against the insurance company and in favor of the insured. *Id.*

In *Kraemer Bros., Inc. v. United States Fire Insurance Co.*, 89 Wis. 2d 555, 561–62, 278 N.W.2d 857, 860 (1979), our supreme court reiterated the well-established rule:

" '. . . The case comes clearly within the rule that where language is plain and unambiguous, the apparent import of the words must govern, and the rule that where there is no uncertainty as to the meaning of the words used in the contract, and where such uncertainty exists but there is no extrinsic evidence or circumstance bearing on the subject to be considered in determining the meaning attributed to them by the parties when the contract was made, the proper interpretation of the words and construction of the contract are solely for the court.' " [Citations omitted.]

Continental argues that, under the facts of this case, a plain reading of the language of the exclusionary clause can produce only one conclusion: it should be absolved from liability. The trial court, in denying Continental's motions based on the exclusionary clause, stated:

The exclusionary clause of the policy on which defendant [Continental] . . . relies relates to [a] "Pollution" type of damage.

This is not a pollution case. This is an action for property damage alleged to have been caused by the direct application of sulphuric acid into a concrete sewer.

It is clear that the exclusionary clause does not cover this sort of situation.

In support of the trial court's determination, the cities contend: (1) that the exclusionary clause applies only to liability for environmental pollution; (2) that construction of a similar claim in other jurisdictions supports the conclusion that the exclusionary clause applies only to liability for environmental pollution; (3) that the exclusionary clause should be construed to afford the greatest protection to Allied; (4) that public policy and the purpose of the clause do not preclude coverage; and (5) that the discharge of acid by Allied should be considered sudden and accidental, thereby rendering inoperative the exclusionary clause.

An examination of the clause's wording reveals that it is to be applied to "bodily injury or property damage." There are no words of limitation or qualification attached to this phrase. In narrowing our scope of inquiry, the clause speaks of property damages arising from the *discharge* of acid.

We must ascertain the ordinary and accepted meaning of "discharge" as used in this context. The ordinary and accepted meaning of a word can be established by reference to a recognized dictionary such as *Webster's Third New International Dictionary,* (1976). *DNR v. Wisconsin Power & Light Co.,* 108 Wis. 2d 403, 408, 321 N.W.2d 286, 289 (1982). *Webster's* lists recognized synonyms for the word "discharge" as used in this context: "unload," "emit," or "pour forth." Three alternative areas are listed in the clause where a discharge may occur: (1) "into or upon land; (2) the atmosphere; and (3) any water course or body of water."

The question of whether this type of exclusionary clause is applicable to a case of this nature is one of first impression in Wisconsin. Other jurisdictions have had the occasion to explore the implications of this clause, but the factual circumstances presented and the precise issues examined in those cases leave us unconvinced that

the plain wording of this clause is intended to restrict the type of property affected.[1]

The cities argue that a "sewer system ought not be included within the meaning of the words 'land,' 'atmosphere,' 'or any water course or body of water'" as they are used in the exclusionary clause.

Essentially the same clause was under examination in *Pepper Industries, Inc. v. Home Insurance Co.*, 134 Cal. Rptr. 904 (Cal. App. 1977). There, the insurer also argued that the words "land, the atmosphere or any watercourse or body of water" used in the exclusionary clause are all-inclusive and embrace the term "sewers." *Id.* at 908. This point of contention was not dispositive of the case, but the court agreed that the words used in the exclusion "were intended to include any and all possible areas of discharge. . . ." *Id.* Because this practical construction is most persuasive, we adopt the same interpretation and conclude that a sewer system was intended to be included in the areas of possible discharge and that this is the type of discharge envisioned by the exclusionary clause.

The cities next contend that if a discharge of acid is found to have occurred, it was of a "sudden and accidental" nature so as to make the clause inoperable because the clause states that "this exclusion does not apply if such discharge . . . is sudden or accidental." We do not agree with this contention.

When a condition is caused by accident, our supreme court has limited coverage to: " 'injuries caused by a

[1] *See A-1 Sandblasting & Steamcleaning Co. v. Baiden*, 643 P.2d 1260 (Ore. 1982); *Niagara County v. Utica Mut. Ins. Co.*, 439 N.Y.S.2d 538 (N.Y. App. Div 1981); *Allstate Ins. Co. v. Klock Oil Co.*, 426 N.Y.S.2d 603 (N.Y. App. Div. 1980); *Lansco, Inc. v. Department of Envtl. Protection*, 350 A.2d 520 (N.J. Super. Ct. 1975).

sudden and identifiable event with respect to both location and time. This is intended to rule out exposure injuries, incurred over a period of time, such as the harmful effects of obnoxious fumes, stream pollution, vibration or noises.' " *See Clark v. London & Lancashire Indemnity Co. of America,* 21 Wis. 2d 268, 283, 124 N.W.2d 29, 36–37 (1963).

In spite of the cities' contention that any runoffs that may have occurred were sudden and accidental, the record and common sense stand in firm refutation of the validity of such a conclusion. The uncontroverted expert testimony establishes that in order for the damage to have been created by the acid levels which existed, the sewers had to have been subject to the acid for a period of from two to ten years. When this is considered together with Allied's normal twenty-four hour workday, it provides more than adequate grounds to reject the cities' contention.

Because we conclude that the exclusionary clause is applicable to this case, we hold that Continental's policy of insurance does not provide Allied coverage for this situation.

## DIRECTED VERDICT

Continental and Allied argue that, because the testimony presented by them creates factual issues, the trial court erred in directing the verdict in favor of the cities on the issues of negligence and proximate costs. We disagree.

The disposition of this issue is controlled by the following well-established principles:

The standard for determining whether the trial court erred in directing a verdict was stated in *Zillmer v. Miglautsch* (1967), 35 Wis. 2d 691, 699, 151 N.W.2d 741:

"[T]his court must take that view of the evidence which is most favorable to the party (the plaintiff in this case) against whom the verdict was sought to be directed . . . . If there is any evidence to sustain a defense or a cause of action, the case must be submitted to the jury. . . . The weight and sufficiency of the evidence is for the jury . . . as is the weight to be given to the witness' positive or negative testimony . . . Furthermore, it is basic that the credibility of the evidence and the inferences to be drawn therefrom are matters for the jury. . . . If there is any evidence other than mere conjecture or incredible evidence to support a contrary verdict, the case must go to the jury. . . . Incredible evidence is evidence in conflict with the uniform course of nature or with fully established or conceded facts. . . ." [Citations omitted.] *Samson v. Riesing,* 62 Wis. 2d 698, 705–06, 215 N.W.2d 662 (1974).

and, further:

" ' "A verdict ought to be directed if, taking into consideration all the facts and circumstances as they appear in evidence, there is but one inference or conclusion that can be reached by a reasonable man." *Milwaukee v. Bichel,* ante, p. 66, 150 N.W.2d 419.' *Tombal v. Farmers Insurance Exchange, supra* at 68." *Kozlowski v. John E. Smith's Sons Co.,* 87 Wis. 2d 882, 897–98, 275 N.W.2d 915, 922 (1979).

Because, after reviewing the evidence, we conclude that only one inference can be drawn, we hold that the trial court was correct in attributing negligence and proximate cause to Allied.

We are concerned with events occurring between the years 1973 and 1976. Allied was located at 5117 West Lincoln Avenue, West Allis, Wisconsin. There were several catch basins on the premises flowing into a sewer located in thet center of Lincoln Avenue just south of the premises.

Allied was in the business of extracting lead plates from used batteries, smelting the plates and selling the

resultant to metal dealers. Most of the batteries which Allied received contained varying amounts of sulphuric acid depending on their age. While the lead plates were encased in the batteries, they were partially immersed in the acid. By machine process the batteries were cut open and flipped. The casings were drained of the sulphuric acid and flushed by water. The acid content was directed by a trough into a thousand gallon holding tank to be neutralized and then discharged directly into the storm sewer system. During the flipping process, the plates were separated from the casings and conveyed to an out-side yard to be stored in piles to dry. This was done to eliminate the damaging effects that sulphuric acid would have on the smelting furnace. After drying, the plates were then conveyed to the furnace by a forklift.

In December, 1975, the Wisconsin Department of Natural Resources objected to the manner in which the lead plates were being stored on the premises. The department also found an unacceptable level of acidity (pH of 2.5) in the effluent emanating from Allied's premises.[2] By a letter dated February 9, 1976, Allied agreed to recitify this situation as soon as possible. It was not until the spring and summer of 1976, that Allied constructed a concrete bed on which the drying plates were placed. This slab was pitched so that any acidic runoff from the plates would go directly into the neutralizing holding tank within the plant.

In directing the negligence and proximate cause questions, the trial court observed:

The testimony is uncontroverted that there was acid in fluid samples taken from the sewer. The testimony is

[2] The pH factor is the measurement of the acidity of a material. To determine the acidity of a pH meter is used. The scale ranges from 0 to 14. A pH of 7 is neutral solution, neither acid nor alkaline. If a pH reading in the effluent is 5½ to 7, the attack upon the concrete would be mild. Any lower reading would indicate that the effect is more aggressive.

uncontradicted that the portions of the sewer away from the flow of Allied were completely undamaged. The sewer pipe west of Allied showed no damage. The damages start at Allied. Those portions of the sewer that were within from the flow of Allied.

It is admitted by both—all parties that Allied was engaged in a business that involves sulphuric acid. And it seems to the court uncontroverted that this sulphuric acid had to come from Allied. There was no other place that it could possibly come from.

Upon review of the record, we determine that the following facts are undisputed:

(1) the direction of flow through the storm sewer system from west to east and southeast;

(2) the locations of the manholes and sewers ("A–E" Exhibit Nos. 1 and 4) on Lincoln Avenue immediately south of Allied's premises;

(3) the absence of dangerous acidic content in the water flow from the west of Allied's premises, but its presence in water flowing from Allied to the southeast;

(4) the segments of the system deteriorating or destroyed and their connection to the flow from Allied's catch-basin system;

(5) the tardy acknowledgement of Allied on February 9, 1976, of acid runoff and the even later response to correct the situation by placing a pitched concrete slab in the yard to store the drying lead plates.

When these undisputed facts are coupled with the expert testimony, we are inescapably drawn to the same conclusion as that reached by the trial court: Allied was responsible for the negligent discharge of sulphuric acid in the sewer system and that this negligence was the proximate cause of the damage sustained by the cities. We determine that no other reasonable inference can be drawn or conclusion reached, and, therefore, hold that the

trial court properly directed the verdict on the negligence and proximate cause questions.

## TESTIMONY OF GARY GEIPEL

Continental and Allied next argue that the trial court misused its discretion by admitting the testimony of a chemist named Gary Geipel. Continental and Allied argue that Geipel must be considered a previously undisclosed expert witness and therefore his testimony should not have been received. Because Geipel was not called as a witness to give expert opinion, we conclude the trial court did not misuse its discretion.

The city of West Allis called Geipel, a scientific analyst at Sommer-Frey Laboratories, to authenticate the water sample analysis report he had prepared. He testified about his normal duties as an analyst. Geipel stated that he was asked in December, 1975, to perform some tests on water samples he received. He described the tests that he conducted, the analysis used and how the reports were prepared. He identified his report which he had submitted and noted that the report contained the results of his tests. It was not intended that he render an opinion as to the meaning or the significance of the report. That task was given to other witnesses. The trial court, in allowing Geipel to testify, reasoned that he was asked for factual information, not opinion testimony.

When reviewing a discretionary act of a trial court, all that an appellate court need determine to sustain the discretionary act is that the trial court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that

a reasonable court could reach. *Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175, 184 (1982). Here, the basis for the trial court's decision is not without reason. Therefore, we hold that the trial court did not misuse its discretion by allowing Geipel to testify.

## SEWER EXAMINATION REPORTS

Continental and Allied next argue that the trial court erred in admitting into evidence a series of sewer examination reports because the reports constituted hearsay. Because we conclude that the reports, although hearsay, fit within a well-defined exception to the hearsay rule, we disagree.

Section 908.03 (6), Stats., provides for the admissibility of reports or data compilation, in any form, of acts, opinions or diagnoses made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, unless the source of the information or other circumstances indicate a lack of trustworthiness. The inquiry concerning trustworthiness is a balancing exercise of discretion not to be reversed unless misused. *See Rollie Johnson Plumbing & Heating Service, Inc. v. Department of Transportation*, 70 Wis. 2d 787, 793, 235 N.W.2d 528, 532 (1975).

The reports in question reflect the results of visual inspections made on five separate occasions during the years 1975 through 1976 by sewer examining crews. The reports were all made on the same type of printed form entitled "Sewer Examination Reports" used by the Milwaukee Department of Public Works. Patrick Hawley, the supervisor of these crews, testified that the reports

were made as a part of the regular activities and business of the Bureau of Streets and Sewer Maintenance. It was the regular responsibility of the crew under his supervision to inspect sewers after construction, in the course of street paving and in response to reported problems. The problem in the sewer system in question was discovered as a result of a washout of pavement on the street above. Hawley further stated that he personally knew the individual crew members, was acquainted with their work experience and had confidence in them. Given all of these factors, and in the absence of any reasonable circumstances to indicate a lack of trustworthiness, we conclude that the reports were properly admitted.

Continental and Allied additionally argue that the admission of the sewer examination reports through the testimony of the supervisor denied them their right to cross-examine the makers of the reports. We assign little value to this argument because the identity of the reporters was known to them. The reports had been previously supplied to them as requested and more than adequate opportunity existed for the individuals to be examined.

## JURY INSTRUCTION

Lastly, Continental and Allied argue that the trial court erred in denying their request to give the jury the absent witness instruction modified to apply to the numerous photographs of the damaged sewer segments which existed but which were not produced by the cities at trial. *See* Wis J I—Civil 410. We disagree.

The cities introduced into evidence four photographs depicting the damages and deterioration that existed in the sewer system immediately south of and adjacent to

Allied's premises. Continental and Allied contend that, because the city of Milwaukee did not show the jury all of the photographs (the additional photographs referred to in the sewer examination reports) a modified absent witness instruction should have been given regarding these missing photographs.

In support of their respective positions, both sides refer this court to *Ballard v. Lumbermens Mutual Casualty Co.*, 33 Wis. 2d 601, 148 N.W.2d 65 (1967). In *Ballard,* the supreme court stated:

A party to a lawsuit does not have the burden, at his peril, of calling every possible witness to a fact, lest his failure to do so will result in an inference against him. The requirements of the absent material witness instruction should be narrowly construed to be applicable only to those cases where the failure to call a witness leads to a reasonable conclusion that the party is unwilling to allow the jury to have the full truth.

. . . .

It is apparent that policy factors behind this rationale are not present in this case. The plaintiff herein did, in fact, produce two or three possible witnesses to the same facts. The defendant, by being allowed to comment to the jury, was able to make the point he desired and was in no way prejudiced. It was not error to refuse the instruction. *Id.* at 615–16, 148 N.W.2d at 73–74.

From a review of the record, we find no lack of willingness on the part of the cities to fully portray the condition of the sewer segments in question. Corroborating evidence of the damage is of such magnitude that any further delineation would have been not only unwarranted, but superfluous. We note that the trial court allowed Continental and Allied to present argument to the jury concerning the photographs. Because we conclude that *Ballard* is controlling, we hold that the trial court did not err by refusing to give this instruction.

CROSS-APPEAL

On cross-appeal,[3] both cities contend that the trial court erred in granting the motion to dismiss that part of their claim for damages relating to employee salaries and in instructing the jury not to consider as damages any amount for time spent by the employees on this project. The trial court at various times, both during and after trial, had an opportunity to consider this issue. The basis for the trial court's ruling was that "there has been no testimony presented showing the necessity for the time spent or the reasonableness of the charges made." Because we conclude that it is not essential that proof of the "necessity and reasonableness" of the cities' expenses be received in evidence before it can be considered by the jury, we disagree. *See Gerbing v. McDonald*, 201 Wis. 214, 218–19, 229 N.W. 860, 862 (1930).

In the special verdict, the jury was asked what sum of money would fairly and reasonably compensate the cities. Thus, it was for the jury, after reviewing all of the relevant evidence, to determine the reasonable compensation due the cities. It may be true that here the cities did not produce expert testimony as to the reasonableness and necessity of the employees' salary expense allocated to the project, but the trial court did not disagree that it was reasonable to assign the designated employees to the job.

When we consider the enormity of this repair project; the number of highly skilled supervisory personnel involved; the well-detailed and documented time reports; the compensation rates and hours devoted to the project;

---

[3] We note that the cities have moved to summarily reverse the trial court on this issue because Allied and Continental have failed to respond to the cities' briefs in support of their cross-appeal. Because we hold that the trial court erred in refusing to allow the cities to recover the cost of labor, we deny the motion.

and the testing, surveying, inspection and formulation of plans that were required; we conclude that the record contains an abundance of substantial evidence upon which the jury could determine reasonableness. In view of the state of the record, we hold that it was not incumbent upon the cities to present expert testimony as to the reasonableness of the employees' salaries.

Having resolved this issue, we must next address the question of whether the employees' salaries attributable to the repair project is a recognizable element of damages. In *State v. Service Electric & Supply, Inc.*, 106 Wis. 2d 396, 316 N.W.2d 390 (1982), the state lost the services of one of its field representatives due to his having to spend additional time on a project as the result of a breach of contract by Service Electric. The supreme court held that it was proper for the state to recover those portions of his salary which represented the loss of his services. The court stated: "Compensating the state in this agreed amount is necessary to make the state whole and to restore it to the position it would have been in had the breach not occurred." *Id.* at 405, 316 N.W.2d at 395. While this case does not involve a breach of contract, we determine that *Service Electric* is helpful to our resolution of this issue.

It is doubtless that, had all of the work required to repair the sewer system been let out to independent contractors, the cities could have recovered their out-of-pocket expenses. These expenses in all likelihood would have included an employee-salary factor if salaried employees were required in the performance of this work.

In support of their argument, the cities refer this court to *Curt's Trucking Co. v. City of Anchorage*, 578 P.2d 975 (Alaska 1978). We have reviewed *Curt's* and the cases cited therein and are persuaded that the employees' salaries are a recognizable element of damages. *Id.* at

977–79. There, a utility owned by the city of Anchorage repaired an overhead cable that had been severed by a truck. The city sought to recover damages resulting from the negligence of the truck company. The parties stipulated that the trucking company was liable for the direct costs of repairing the cable including material and labor. Of concern was the city's claim for additional overhead expenses. In awarding overhead expenses, the court referred to *Crain Bros., Inc. v. DuQuesne Slag Products, Co.,* 273 F.2d 948, 952–53 (3rd Cir. 1959) where the following analysis was used:

[T]he reason a party which performed its own repairs may recover an amount including such overheard elements is that its actual loss would be the full amount charged by the independent contractor, as if it paid that amount out-of-pocket. Thus, where plaintiff has carried out the repairs itself, the losses and expenses actually incurred as a result of the accident should be included in a damage award. *Curt's, supra,* at 978.

The facts in the case before us do not involve a claim for indirect costs, but the persuasive effects of the cases which have resolved this issue are all the more supportive for the conclusion that the direct employees' salary costs are a recognizable claim for damages and we so hold. *See Service Electric, supra.*

We conclude that, by preventing the jury from considering these expenses when determining damages, a substantial right of the cities was affected; and, therefore, we reverse and remand with instructions that a new trial be held on the damage issue. *See* sec. 805.18, Stats.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded for a new trial.