Sandra DONALDSON, April Schmitt and John D. Schmitt, Plaintiffs,

STATE of Wisconsin, Subrogated-Plaintiff,

v.

URBAN LAND INTERESTS, INC., Defendant-Appellant,†

The HANOVER INSURANCE COMPANY, Defendant-Respondent,

BARSTOW ASSOCIATES, a Limited Partnership, North American Mechanical, Inc., ABC Insurance Company and DEF Insurance Company, Defendants.

Court of Appeals

*No. 95–3015. Submitted on briefs August 12, 1996.—Decided October 9, 1996.*

(Also reported in 556 N.W.2d 100.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Douglas B. Clark* and *Nancy Y. T. Hanewicz* of *Foley & Lardner* of Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Jeffrey Leavell* and *Gregory Boe* of *Jeffrey Leavell, S.C.* of Racine.

Before Anderson, P.J., Nettesheim and Snyder, JJ.

NETTESHEIM, J. Urban Land Interests, Inc., (ULI) appeals from the trial court's grant of summary judgment to its insurer, The Hanover Insurance Company. The trial court ruled that the pollution exclusion clauses in the Hanover policies barred coverage to ULI. Specifically, the court ruled that exhaled carbon dioxide is a "pollutant" which was "discharged, dispersed or released" within the meaning of the pollution exclusion clauses. We agree with the court's construction of the policies. We therefore affirm the grant of summary judgment to Hanover.

## BACKGROUND

The factual background of the case is not in dispute. Both Sandy Donaldson and April Schmitt worked in the clerical room of the Barstow building managed by ULI. During the course of their employment, Donaldson and Schmitt began to suffer from a number of symptoms, most of which would occur shortly after arriving at work and resolve within two hours of leaving work. Donaldson complained of headaches, sinus infections, eye irritation, extreme fatigue, upset stomachs, sinus drainage and asthma. Schmitt suffered from a sore throat, nausea, ear pounding, sinus pain and congestion.

As a result, both Donaldson and Schmitt sought medical treatment from Dr. Jordan Fink of the Medical College of Wisconsin. Fink concluded that both Schmitt and Donaldson had symptoms which were "consistent

410

with a diagnosis of 'sick building syndrome.' " In a letter to a worker's compensation claims examiner regarding Donaldson, Fink stated:

> I believe that many of Ms. Donaldson's reported symptoms were causally related to exposures of excessive concentrations of air contaminants in the basement of the Barstow Building. While specific irritants and air concentrations were not determined, the accumulation of excessive concentrations of carbon dioxide provide sufficient factual foundation to conclude that the ventilation was inadequate and, as a result, a variety of other air contaminants likely accumulated as well.

Fink's diagnosis was based in part upon an industrial hygiene survey conducted by the Safety and Buildings Division of DILHR in response to employee concerns about the quality of air in the Barstow building. The results of the survey indicated that while certain areas of the Barstow building met or exceeded air exchange standards, other areas had little or no ventilation. The survey stated in relevant part that there "was not the required air circulation of 6 air changes per hour. The clerical area (Room 100) did not have any circulation." Fink therefore recommended that Donaldson and Schmitt avoid exposure to the clerical area until the ventilation system in the building had been repaired.

In July 1994, Donaldson and Schmitt brought the instant action against ULI and Hanover. Their complaint alleged injuries caused by the "poor air quality" in the Barstow building.[1] Hanover denied its duty to defend claiming that its policy did not afford

---

[1] Schmitt and Donaldson also named other defendants who are not parties to this appeal.

coverage. Hanover brought a motion for summary judgment to resolve this issue. Specifically, Hanover relied on the pollution exclusion provision recited in both the comprehensive general liability policy and the umbrella excess liability policy issued to ULI. Hanover claimed that these provisions precluded coverage for bodily injury arising from airborne contaminants. ULI filed a cross-motion for summary judgment on the same issue, requesting the court to find that the exclusion clauses did not bar coverage and to require Hanover to defend on the plaintiffs' claims.

The trial court granted Hanover's motion for summary judgment. The court also denied ULI's reconsideration motion and confirmed the grant of summary judgment to Hanover. ULI appeals.

## DISCUSSION

### *The Insurance Policy*

The Hanover policies each contain an "absolute"[2] pollution exclusion clause which excludes coverage for:

> (1) "bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge,

---

[2] As ULI explains in its brief:

The exclusion clause . . . is called "absolute" to distinguish it from the "sudden and accidental" pollution exclusion clause which was the industry standard until 1985. Both clauses exclude coverage for injuries caused by the "discharge, dispersal, seepage, migration, release or escape of pollutants." The "sudden and accidental" clause, however, does not exclude such injuries if the release was sudden and accidental." Compare the "absolute" exclusion in this case . . . with the "sudden and accidental" exclusion discussed in *Just v. Land Reclamation Ltd.*, 155 Wis. 2d 737, 456 N.W.2d 570 (1990).

dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site, or location which is or was at any time owned or occupied by, or rented or loaned to, any insured

(2) . . . Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

The trial court held that the exhaled carbon dioxide was a "gaseous irritant" which constituted a pollutant, and that the expelled accumulation of carbon dioxide qualified as a "discharge, dispersal, seepage, migration, release or escape of pollutants"[3] within the meaning of the policy. Thus, the court granted summary judgment to Hanover.

We review summary judgment de novo, using the same standards and methodology applied by the trial court. *Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625, 629 (1991). The court must grant summary judgment if the pleadings, depositions, answers, admissions and affidavits show that there is no genuine issue of material fact and, as a matter of law, the moving party is entitled to judgment. *Id.*

Whether the pollution exclusion clause of the Hanover policy is applicable to the situation at bar breaks down into two inquiries: 1) is exhaled carbon dioxide a pollutant under the terms of the policy; and, if so (2) was the exhaled carbon dioxide discharged, dispersed, etc., within the meaning of the policy? Both

---

[3] Hereafter, we refer to this clause as a "discharge."

inquiries must be answered in the positive for the pollution exclusion clause to apply.

Two court of appeals decisions involving pollution exclusion clauses are relevant to our discussion. In *United States Fire Ins. Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 476 N.W.2d 280 (Ct. App. 1991), the court concluded that the exclusion clause barred coverage. In *Leverence v. United States Fidelity & Guar.*, 158 Wis. 2d 64, 462 N.W.2d 218 (Ct. App. 1990), the court concluded that the exclusion clause did not bar coverage. Despite the opposite conclusions, we conclude that the cases are not in conflict and that they support Hanover's argument for no coverage.

### Pollutant

We first consider whether exhaled carbon dioxide is a "pollutant" within the meaning of the exclusion clause.

In *Ace Baking*, ice cream cones manufactured by Ace Baking were stored in the same warehouse as the fabric softener *Bounce*. *Ace Baking*, 164 Wis. 2d at 501, 476 N.W.2d at 281. Following a complaint by one of its customers, an investigation revealed that the fragrance additive, linalool, from the fabric softener caused the ice cream cones to become unusable. *Id.* Ace Baking presented a claim to its insurer for damage to its cones. The insurer refused coverage under the policy's pollution exclusion clause. *Id.*

Similar to the Hanover policy, the pollution exclusion clause in *Ace Baking* barred recovery for losses "caused by or resulting from . . . release, discharge or dispersal of 'pollutants.' " *Id.* at 502, 476 N.W.2d at 281. However, unlike the Hanover policy, the *Ace Baking* policy did not define the term "pollutant." *Id.* at 502, 476 N.W.2d at 281-82. Thus,

the decision in *Ace Baking* focused on the meaning to be given to that term.

The trial court in *Ace Baking* had concluded that the term "pollutant" should be given a narrow meaning: "The ordinary person would interpret pollutant as something that would adversely affect the environment or a person's health." *Id.* at 502, 476 N.W.2d at 282. Under this definition, the trial court concluded that linalool was not such a pollutant as indicated by the affidavits but could and apparently did affect a product's taste or smell. *See id.* The court of appeals disagreed. The court held that if the substance which contaminated the ice cream cones was "foreign" to the cones, the substance qualified as a pollutant. *Id.* at 505, 476 N.W.2d at 283. The court noted:

> it is a rare substance indeed that is *always* a pollutant; the most noxious of materials have their appropriate and non-polluting uses. . . . Here, although linalool is a valued ingredient for some uses, it fouled Ace Baking's products. Accordingly, it was a "pollutant" in relation to those products, and coverage for the resulting damages is excluded from the United States Fire policy.

*Id.*

In the instant case, we need not search for a definition for "pollutant," since the Hanover policy defines it as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." The summary judgment record, as well as common knowledge, demonstrates that carbon dioxide is a

gaseous substance which, at certain levels, can become an irritant or contaminant.[4]

ULI argues, however, that the pollution exclusion clause should not apply to carbon dioxide, a naturally created substance which, absent concentrated levels, is harmless. However, as *Ace Baking* notes, "it is a rare substance indeed that is *always* a pollutant." *Id.* Carbon dioxide is such a substance. In its ordinary state, it is a harmless substance. But in concentrated levels, it can become injurious, even lethal. At those levels, it is "foreign" to a safe human environment. *See id.*

■ We affirm the trial court's ruling that the exhaled carbon dioxide was a pollutant within the meaning of the Hanover policy.

### Discharge of Pollutants

Having held that the carbon dioxide constituted a pollutant, we next address whether the carbon dioxide was discharged within the meaning of the exclusion clause.

In *Leverence*, the occupants of prefabricated homes manufactured by Tri-State Homes alleged that their homes retained excessive moisture within the exterior walls. *Leverence*, 158 Wis. 2d at 72, 462 N.W.2d at 222. The retained moisture promoted the growth of mold, mildew, fungus, spores and other toxins which posed a

---

[4] Fink, the treating physician for two of the plaintiffs, used the term "contaminants" throughout his reports regarding the plaintiffs' conditions. Fink concluded that "the accumulation of excessive concentrations of carbon dioxide provide sufficient factual foundation to conclude that the ventilation was inadequate and, as a result a variety of *other* air contaminants likely accumulated as well." (Emphasis added.)

continuing health risk and adversely affected the value of the units. *Id.* The occupants sought damages against Tri-State and its insurer for their bodily injuries and costs of repairs. *Id.* Tri-State's insurer denied coverage relying on the policies' pollution exclusion clauses. *Id.* at 96, 462 N.W.2d at 232. The pollution exclusion clause precluded coverage for:

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.

*Id.*

The *Leverence* court held that the exclusion clause did not bar coverage because the growth of the microorganisms was the result of water vapor trapped in the walls. *Id.* at 97, 462 N.W.2d at 232. As such, the court concluded that the contaminants were not released within the meaning of the policy, "but rather formed over time as a result of environmental conditions." *Id.*[5]

---

[5] In addition, the court held that the pollution exclusion clause was inapplicable despite the coverage preclusion for discharge, dispersal, release or escape which was "sudden and accidental." Citing the Wisconsin Supreme Court's definition of "sudden and accidental" to mean "unexpected and unintended," *Just*, 155 Wis. 2d at 746, 456 N.W.2d at 573, the court found that the growth of the molds, fungus and mildew were unexpected and unintended and, therefore, found, in addition, that the exclusion was inapplicable based on the *Just* decision. *Leverence v. United States Fidelity & Guar.*, 158 Wis. 2d 64, 97, 462 N.W.2d 218, 232 (Ct. App. 1990). This determination,

ULI argues that the same situation exists here. We disagree. In this case, the exhaled carbon dioxide was not converted from one substance to another; nor was it formed over time; nor was it trapped in some unknown confined area. To the contrary, the carbon dioxide was in its potentially harmful state immediately upon being expelled directly into atmosphere of the work environment by the human act of breathing.

We affirm the trial court's ruling that the pollutant was discharged within the meaning of the exclusion clause.

*Environmental vs. Nonenvironmental Damage*

ULI also argues that the insurance industry intends pollution exclusion clauses to apply only in situations of environmental injury or damage to soil, air or water—not to nonenvironmental injury situations such as the instant case. ULI presents insurance industry history to support this argument. However, our first and principal focus is on the language of the insurance policy itself. As our previous discussion reveals, we construe the exclusion clause to cover the facts of this case.

Moreover, *Ace Baking* already demonstrates a scenario in which a pollution exclusion clause governed a nonenvironmental damage situation. The same is suggested by *Leverence* where, were it not for the absence of a discharge or release of the contaminant, the exclusion clause would have applied to bar coverage in a nonenvironmental injury setting.

however, was secondary to the court's holding that the exclusion was inapplicable because the contaminants had not been released.

## CONCLUSION

We conclude that the pollution exclusion clause precludes coverage to ULI for the claims of the plaintiffs in this case. We affirm the trial court's grant of summary judgment to Hanover.

*By the Court.*—Order affirmed.

ANDERSON, P.J. (*dissenting*). I respectfully dissent from the majority's conclusions that concentrated levels of carbon dioxide are a pollutant and that carbon dioxide was discharged within the meaning of the insurance contract's exclusion clause. The majority's opinion unnecessarily broadens the coverage of the pollution exclusion clause.

Recently, we held that one form of a pollution exclusion clause was ambiguous because there were two reasonable interpretations of the clause.[1] In *Beahm v. Pautsch*, 180 Wis. 2d 574, 584, 510 N.W.2d 702, 706 (Ct. App. 1993), we held that the clause could be read to exclude coverage for liability that accrues from the discharge of smoke into the atmosphere or it could be read to exclude coverage for liability where the discharged substance caused harm because of its toxic

---

[1] The clause under scrutiny in *Beahm v. Pautsch*, 180 Wis. 2d 574, 580, 510 N.W.2d 702, 705 (Ct. App. 1993), provided in part:

> This policy does not apply to liability which results directly or indirectly from:
>
> > the discharge, dispersal, release or escape of smoke, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or a water course, body of water, bog, marsh, swamp or wetland.

nature. In adopting a limiting interpretation of the pollution exclusion clause, we noted that "[n]owhere in its history is there any suggestion that the pollution exclusion clause was intended to exclude more than coverage for liability for environmental damages." *Id.*[2]

I am convinced that the language in the pollution exclusion clause under analysis in this case is also ambiguous. There are at least two interpretations of the clause. First, it can be interpreted as the majority interprets it, to exclude coverage for damages arising from an accumulation of carbon dioxide due to inadequate building ventilation; or, second, it can be read to limit coverage to liability for industrial environmental damages as that is understood by a reasonable person.

When confronted with an ambiguous exclusionary clause, the rule of construction is that the clause is to be strictly construed against the insurer and must also be interpreted to mean what a reasonable person in the position of the insured would have understood the words of the contract to mean. *Tara N. v. Economy Fire & Casualty Ins. Co.,* 197 Wis. 2d 77, 90-91, 540 N.W.2d 26, 32 (Ct. App. 1995). I conclude that a reasonable person would narrowly interpret the pollution exclusion clause to situations involving environmental catastrophes related to industrial pollution. This interpretation is consistent with the principle that we narrowly construe exclusionary clauses, rather than

---

[2] In *Motorists Mut. Ins. Co. v. RSJ, Inc.,* 926 S.W.2d 679, 681 (Ky. Ct. App. 1996), the Kentucky court commented that "[t]he drafters' utilization of environmental law terms of art ('discharge,' 'dispersal,' 'seepage,' 'migration,' 'release,' or 'escape' of pollutants) reflects the exclusion's historical objective—avoidance of liability for environmental catastrophes related to intentional industrial pollution."

broaden them to include the concentration of "foreign" substances due to poor building ventilation. A reasonable person would expect the clause to avoid liability for the spillage of petroleum products in a creek, but would not expect it to include the avoidance of liability for the accumulation of carbon dioxide in an office because provisions were not made for introducing fresh air into the office.

The majority relies upon *United States Fire Ins. Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 476 N.W.2d 280 (Ct. App. 1991), for the proposition that the term "pollutant," as used in the absolute pollution exclusion clause, is not ambiguous because it is not "reasonably or fairly susceptible to more than one construction." *Id.* at 503-05, 476 N.W.2d at 282-83. In *Ace Baking*, it was concluded that a "pollutant" can be any substance, foreign to another substance, that makes it physically impure or unclean. *Id.* at 505, 476 N.W.2d at 283. Using this language, the majority concludes that in concentrated levels carbon dioxide "can become injurious, even lethal. At those levels, it is foreign' to a safe human environment." Majority op. at 412.

The majority's conclusion is imprecise because it does not identify at what level concentrations of carbon dioxide qualify as a foreign substance. It also fails to specify how much exposure, at that level, is required before the carbon dioxide becomes injurious to human health. For example, OSHA has established a limit of exposure of 5000 ppm for an eight-hour shift. *See* Occupational Safety and Health Standards, Subpart Z—Toxic And Hazardous Substances, 29 C.F.R. § 1910.1000 (1996).

My principal disagreement with the majority is the conclusion that this case is different from *Leverence v. United States Fidelity & Guar.*, 158 Wis. 2d 64, 462

N.W.2d 218 (Ct. App. 1990). The majority distinguishes *Leverence* as follows:

> In this case, the exhaled carbon dioxide was not converted from one substance to another; nor was it formed over time; nor was it trapped in some unknown confined area. To the contrary, the carbon dioxide was in its potentially harmful state immediately upon being expelled directly into the atmosphere of the work environment by the human act of breathing.

Majority op. at 413-14. This conclusion that carbon dioxide is potentially harmful as soon as it is expelled is inconsistent with the majority's earlier conclusion that "[i]n its ordinary state [carbon dioxide] . . . is a harmless substance. But in concentrated levels, it can become injurious, even lethal. At those levels, it is foreign' to a safe human environment." Majority op. at 412.

The differences between *Leverence* and this case are insignificant. In *Leverence,* the allegation was that the construction methods and materials allowed water vapor to accumulate in the walls. *Id.*, 158 Wis. 2d at 72, 462 N.W.2d at 222. In this case, the allegation is that improper construction—the failure to provide outside air intake—caused the accumulation of carbon dioxide. In *Leverence*, no contaminants were released but rather they formed over time because of environmental conditions. *Id.* at 97, 462 N.W.2d at 232. In this case, the concentrations of carbon dioxide formed over time due to environmental conditions created by the failure to introduce fresh air into the building. The only difference in *Leverence* and this case is that in *Leverence* it was microorganisms that were promoted by the presence of accumulated water vapor that did

the damage, *id*. at 72, 97, 462 N.W.2d at 222, 232; and here, it is the level of carbon dioxide that allegedly caused the damage. Because the operative facts are parallel between *Leverence* and this case, I would conclude that the pollution exclusion clause does not apply.

I also believe the pollution exclusion clause is inapplicable because the presence of carbon dioxide was not the result of "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." First, the involuntary human act of exhaling waste products from the act of breathing cannot reasonably be made to fit within the insurance policy's alternatives of how a pollutant becomes present in the environment. Second, the insurance policy language indicates that the pollutant's presence must result from some form of action; in this case, the presence of carbon dioxide is the result of inaction—failing to provide fresh outside air to the office.

The Seventh Circuit has had the occasion to discuss a pollution exclusion clause similar to the one in this case. I find that court's discussion to be persuasive.

> Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one

would not ordinarily characterize these events as pollution.

To redress this problem, courts have taken a common sense approach when determining the scope of pollution exclusion clauses. *Westchester Fire Ins. Co. v. City of Pittsburg,* 768 F.Supp. 1463 (D. Kan. 1991), *aff'd,* 987 F.2d 1516 (10th Cir. 1993), for instance, held that the clause did not bar coverage for injuries arising from an individual's ingestion of malathion during a municipal pesticide-spraying operation. *Id.* at 1468-71. Similarly, *A-1 Sandblasting & Steamcleaning Co. v. Baiden,* 53 Or.App. 890, 632 P.2d 1377, 1379-80 (1981), *aff'd,* 293 Or. 17, 643 P.2d 1260 (1982), held that coverage was not barred for paint damage to vehicles which occurred during the spraypainting of a bridge. *See also Atlantic Mut. Ins. Co. v. McFadden,* No. 90-5487, slip op. (Mass. Super. Ct. May 28, 1991) (clause does not bar recovery for apartment-dweller's ingestion of lead paint) *aff'd,* 595 N.E.2d 762 (Mass. 1992); *Cole v. Celotex Corp.,* No. 87-6170 (La.Dist. Feb. 15, 1990) (recovery not barred for release of asbestos particles during installation, handling and removal of insulation). The bond that links these cases is plain. All involve injuries resulting from everyday activities gone slightly, but not surprisingly, awry. There is nothing that unusual about paint peeling off of a wall, asbestos particles escaping during the installation or removal of insulation, or paint drifting off the mark during a spraypainting job. A reasonable policyholder, these courts apparently believed, would not characterize such routine incidents as pollution.

*Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037, 1043-44 (7th Cir. 1993).

I dissent because I believe the majority opinion broadens the scope of the pollution exclusion clause bringing within its exclusion many incidents that are not, historically, industrial pollution. The accumulation of carbon dioxide in a building and the resulting injuries are the result of the everyday activity of exhaling gone slightly awry because the building owner failed to ventilate the building. Under such circumstances the pollution exclusion clause should not apply.