Betty LEVERENCE, Thomas Leverence, Ellen Schneider, Eugene Schneider, David Sleight, et al., Plaintiffs-Petitioners-Appellants-Cross Respondents,†

v.

UNITED STATES FIDELITY & GUARANTY, a foreign corporation, National Surety Corporation, a foreign corporation, Home Insurance Company, a foreign corporation, Chicago Insurance Company, a foreign corporation, The Fidelity & Casualty Insurance Company of New York, a foreign corporation, The Aetna Casualty & Surety Company, a foreign corporation, Interstate Fire & Casualty Company, a foreign corporation, Firemans Fund Insurance Company, a Wisconsin corporation, and First State Insurance Company, a foreign corporation, Defendants-Respondents-Cross Appellants,†

EMPLOYERS INSURANCE OF WAUSAU, a mutual company, a Wisconsin corporation, and Product Fabrication Service, Defendants-Respondents,†

Edward ALVEY, Sr., Defendant-Co-Appellant-Cross Appellant-Cross Respondent,

THILMANY PULP & PAPER CO., Paper Corporation of America, a Wisconsin corporation, d/b/a Universal Paper Corporation, Defendants,

Donald MEARS, Defendant-Petitioner-Co-Appellant-Cross Appellant.

Court of Appeals

†Petition to review denied.

No. 89-1646. Submitted on briefs May 5, 1990.—Decided
September 5, 1990.

(Also reported in 462 N.W.2d 218.)

On behalf of the plaintiffs-petitioners-appellants-cross respondents, Betty Leverence, et al, the cause was submitted on the joint briefs of *James A. Olson, Steven J. Schooler, Marsha M. Mansfield* of *Lawton & Cates, S.C.* of Madison, and *Jerold Oshinsky* and *Nancy A. Markowitz* of *Anderson, Kill & Oshinsky* of Washington, D.C..

On behalf of the defendant-petitioner-co-appellant-cross appellant, Donald Mears, the cause was submitted

on the briefs of *Gerald M. O'Brien* of *Anderson, Shannon, O'Brien, Rice & Bertz* of Stevens Point.

On behalf of the defendant-co-appellant-cross appellant-cross respondent, Edward Alvey, Sr., the cause was submitted on the briefs of *Michael J. Stingl* and *Michael L. Eckert* of *Eckert Law Office* of Rhinelander.

On behalf of the defendant-respondent-cross appellant, First State Insurance Company, the cause was submitted on the briefs of *Dennis K. Sage* of *Otjen, Van Ert, Stangle, Lieb & Weir, S.C.* of Milwaukee.

On behalf of the defendants-respondents-cross appellants, Chicago Insurance Company and Interstate Fire and Casualty Company, the cause was submitted on the briefs of *Barrett J. Corneille* of *Bell, Metzner, Gierhart & Moore, S.C.* of Madison.

On behalf of the defendant-respondent-cross appellant, United States Fidelity and Guaranty, the cause was submitted on the brief of *Scott W. Clark* of *Clark & Clark* of Ashland.

On behalf of the defendant-respondent-cross appellant, The Fidelity and Casualty Insurance Company of New York, the cause was submitted on the briefs of *Joanne Swieciak Mack* and *Bruce D. Huibregtse* of *Stafford, Rosenbaum, Rieser & Hansen* of Madison.

On behalf of the defendant-respondent, Product Fabrication Service (PFS), the cause was submitted on the brief of *Rhea A. Myers* of *Stroud, Stroud, Willink, Thompson & Howard* of Madison.

On behalf of the defendant-respondent-cross appellant, The Aetna Casualty and Surety Company, the cause was submitted on the brief of *Barbara R. Hatch* of *Murnane, Conlin, White, Brandt and Hoffman* of St. Paul, Minnesota.

On behalf of the defendant-respondent-cross appellant, Home Insurance Company, the cause was submit-

ted on the briefs of *Keith F. Ellison* and *Peter L. Hessert* of *Patterson, Richards & Hessert* of Wausau.

On behalf of the defendants-respondents-cross appellants, Firemans Fund Insurance Company and National Surety Corporation, the cause was submitted on the joint briefs of *David A. Piehler* and *Jeffrey J. Strande* of *Terwilliger, Wakeen, Piehler & Conway* of Wausau, and *Donald A. Vogelsang* and *David E. Schoenfeld* of *Grippo & Elden* of Chicago, Illinois.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. Occupants of homes built by Tri-State Homes, Inc., appeal a summary judgment dismissing their claims for negligence and strict liability against Tri-State's insurers and an inspection service, Production Fabrication Service (PFS). The trial court held that the insurers were entitled to summary judgment because Tri-State had failed to provide timely notice of an occurrence as required by the policies. The trial court also ruled that the inspection agency had no duty to the occupants independent of its contractual obligations to Tri-State, and that the occupants failed to demonstrate any breach of these contractual obligations. Although these two rulings disposed of the entire claim, the trial court went on to rule on other policy defenses raised by the insurance companies in the event that its decision were overturned on appeal. Therefore, several additional rulings are also challenged by the occupants and the insurers on cross-appeal.

The occupants raise eight issues on appeal. We conclude that material issues of fact exist with regard to the notice of occurrence issue, as well as other issues. Accordingly, the summary judgment is reversed in part. We agree with the trial court's rulings that are challenged on cross-appeal, and therefore affirm the judg-

71

ment with respect to these issues. Therefore, the judgment is affirmed in part, reversed in part and the cause is remanded for further proceedings consistent with this opinion.

Tri-State manufactured prefabricated homes during the 1970's and the 1980's and marketed them in northern Wisconsin, Minnesota and Michigan's upper peninsula. Donald Mears was president, and Edward Alvey, Sr., was vice-president until 1978 when Mears sold out. Alvey then served as president until the business was liquidated in bankruptcy in 1987.

This action, brought by 798 occupants of 222 Tri-State homes, is premised on strict liability and negligence theories. The defendants on appeal consist of insurance companies and a private inspection agency, PFS. The occupants seek damages from the insurance companies and PFS for their bodily injuries and for the cost of repairs required due to their bodily injuries or illnesses.

The occupants allege that their homes retain excessive moisture within their exterior walls. This moisture allegedly promotes mold, mildew, fungus, spores and other toxins that are a continuing health risk and adversely affect the value of the units. The occupants allege that the excessive moisture resulted from the defective design of the walls and roofs, inappropriately selected building materials and faulty construction practices. Specifically, the occupants object to the use of Thilco paper, a vapor barrier, which was used on the exterior walls.

Tri-State's insurers provided comprehensive general liability insurance coverage to Tri-State between 1970 and 1986.[1]

---

[1]There is a number of insurers because various companies provided coverage at different times. Primary general comprehen-

## I. STANDARD OF REVIEW

A number of issues require the interpretation of insurance policies.

> Interpretation of an insurance contract involves a question of law. An appellate court decides questions of law independently without deference to the decision of the trial court. When construing an insurance contract, an objective test is applied. The objective test requires that the policy be construed as it would be understood by a reasonable person in the position of the insured.

*St. John's Home v. Continental Cas. Co.,* 147 Wis. 2d 764, 781, 434 N.W.2d 112, 119 (Ct. App. 1988) (footnotes omitted). Where the terms of a policy are not ambiguous, a court will simply apply those terms rather than engage in construction. *See Paape v. Northern Assur. Co.,* 142 Wis. 2d 45, 51, 416 N.W.2d 665, 668 (Ct. App. 1987).

When reviewing a grant of summary judgment, we apply the same methodology as the trial court. The moving party has the burden to establish the absence of a factual dispute and that he is entitled to judgment as a matter of law. *Grams v. Boss,* 97 Wis. 2d 332, 338–39,

sive liability insurance coverage for Tri-State was obtained from the following insurance companies: United States Fidelity & Guaranty, National Surety Corporation, The Fidelity & Casualty Company of New York, Home Insurance Company, The Aetna Casualty & Surety Company, and Fireman's Fund of Wisconsin. The following companies provided excess coverage: National Surety Corporation, First State Insurance Company, Interstate Fire & Casualty Company and Chicago Insurance Company. Fireman's Fund and National Surety are not parties to this appeal because the action against them was voluntarily dismissed.

294 N.W.2d 473, 476-77 (1980).. A moving defendant accomplishes this by presenting a defense to defeat plaintiff's complaint. If there is a dispute as to material facts or if different inferences might be drawn from the facts, summary judgment is unavailable. *Id.*

## II. ISSUES RAISED ON APPEAL

### A. Tri-State's Duty to Give Notice of an Occurrence Under the Policies

The occupants first challenge the trial court's ruling that policy language required Tri-State to give its insurers notice of an occurrence in 1979, and, because it failed to do so, no coverage was available. Because the record fails to demonstrate, as a matter of law, when Tri-State became aware of bodily injuries caused by excessive moisture, we conclude that material issues of fact exist as to when Tri-State's duty to give notice arose.

The policies require that notice of an occurrence be given as soon as practicable.[2] The notice provisions state in part:

> NOTICE OF OCCURRENCE: Whenever the insured has information from which the insured may reasonably conclude that an occurrence covered hereunder involved injuries or damage which, in the event that the insured should be held liable, is likely to involve this policy, notice shall be given . . . as soon as practicable . . ..

The term "OCCURRENCE" is defined as:

[2]Section 632.26, Stats., modifies the notice requirement to provide that notice be given as soon as reasonably possible and that failure of notice does not bar liability under the policy if the insurer was not prejudiced.

> [A]n accident or a happening or event or a continu-
> ous or repeated exposure to conditions which unex-
> pectedly and unintentionally results in personal
> injury, property damage . . . during the policy
> period.[3]

The insurers contend that their first notice of any occurrence was upon receipt of the summonses served between February and October 1988. The insurers argue that Tri-State was required to give notice of an occurrence at the time it first learned of property damage.

It is undisputed that Tri-State had notice of the excessive moisture problem and accompanying *property* damage as early as 1976. For example, in a letter dated March 11, 1976, addressed to Tri-State from attorney Roger Gette, an attorney for an owner of a Tri-State home, Gette discussed, among other complaints, problems associated with "inadequate venting and excessive interior humidity conditions." He also wrote that water stains existed on ceilings throughout the house and that doors were warped. This letter was sufficient to alert Tri-State that property damage was resulting from the excessive humidity. The letter also mentions "physical discomfort," but does not allege whether the physical discomfort was caused by the excessive moisture or was the result of several other complaints with the house.

The policies do not require Tri-State to give notice of an occurrence unless the occurrence was covered under the policy. An insured has no duty to give an insurer notice of an uninsured occurrence. *Kolbeck v.*

---

[3]The quoted language is from Chicago's policy. Although there are several different policies of the various insurers, the quoted language is sufficiently similar that the following discussion applies to the policies of all insurers involved.

*Rural Mut. Ins. Co.,* 70 Wis. 2d 655, 661, 235 N.W.2d 466, 470 (1975).

In *Kolbeck,* a farmer noticed the disappearance of several cattle months before he reported the loss. He had no knowledge of a theft. Although theft was insured against, losses due to escape or mysterious disappearance were not covered. Once the farmer came across evidence of the theft, he notified the company promptly. Our supreme court held that the duty to report arose at the time Kolbeck discovered evidence of theft. *Id.* at 659–60, 235 N.W.2d at 469.

*Resseguie v. American Mut. Liab. Ins. Co.,* 51 Wis. 2d 92, 186 N.W.2d 236 (1971), does not require a contrary result. In *Resseguie,* the insured's automobile collided with a pedestrian. Although the pedestrian initially suffered no apparent injury, fifteen months later she brought suit. Our supreme court ruled that the insured failed to give timely notice of an occurrence. *Id.* at 100–01, 186 N.W.2d at 241. The issue was defined as: "when did [the insured] have reasonable ground to believe that he was a participant in an accident." *Id.* at 98, 186 N.W.2d at 240. Without such reasonable grounds he had no duty to report to his insurer. *Id.*

The facts of the present case are more closely aligned with *Kolbeck* than *Resseguie.* The insurers argue, and the trial court found, that property damage to the home itself is excluded under the business risk exclusion.[4] Because defects and resulting damage to the home

---

[4]The occupants do not dispute that the business risk exclusion denies recovery for repairs to the home, but argue that because of the dangers to their health, such repairs are covered as consequential and incidental damages for bodily injuries. This argument will be discussed in more detail in the next section. There is no dispute, apparently, that damage to property other than the home is not excluded.

itself are not covered under the policies, there is no requirement that Tri-State give notice of the damage to the home to the insurers. *See Kolbeck,* 70 Wis. 2d at 661, 235 N.W.2d at 470.

The record does not demonstrate when Tri-State had notice that the occupants alleged health problems resulting from excessive moisture. At this stage of the proceedings, the record shows that the occupants themselves did not connect their continuing health problems with the excessive humidity levels until shortly before or after this suit was filed.[5]

The insurers point to Mears' testimony to establish that he knew uncontrolled humidity levels could lead to eventual health problems. However, Mears also testified that humidity could be controlled by the use of a dehumidifier, or just by opening a window or a door and allowing the air to exchange within the building. He further testified that he was not aware of any health or structural problems resulting from high humidity levels in Tri-State homes until after the news media brought it to his attention. The record however does not show when the news media brought these problems to Mears' attention.

Thus, the record does not sufficiently demonstrate, for summary judgment purposes, when Tri-State should have become aware of potential claims for bodily injuries.[6] No duty to report would arise until after Tri-State

[5]*See* discussion pertaining to the statutes of limitation defense, section IIIA, *infra.*

[6]A letter from Edward Alvey, Sr., to Dave Sleight written December 13, 1985, also discussed property damage. However, the letter does not discuss bodily injuries. The record also is not clear whether Tri-State had notice of property damage other than damage to the product itself.

had sufficient notice of an occurrence not excluded by the policy. It has not been proven, as a matter of law, that Tri-State failed to give notice of an occurrence when required to do so by the policies. Because our holding disposes of the notice issue, we need not address the occupants' remaining theories advanced in support of their argument. *See Gross v. Hoffman,* 227 Wis. 296, 299–300, 277 N.W. 663, 665 (1938).

## B. Business Risk Exclusion of Consequential Damages

The occupants challenge the trial court's ruling that the "business risk exclusion" bars recovery for the cost of repairs to their homes made necessary for health-related reasons. The policies exclude coverage for property damage to "the Named Insured's products arising out of such products or any part of such products . . . to property damage to work performed by or on behalf of the Named Insured arising out of the work or any portion thereof, or out of the materials, parts or equipment furnished in connection therewith."[7] The dispute centers upon what items of damages are recoverable as consequential damages stemming from the nonexcluded bodily injuries.[8]

We discern no ambiguity; the policies plainly exclude the costs of repair due to defective workmanship. *See Bulen v. West Bend Mut. Ins. Co.,* 125 Wis. 2d

[7]All the policies involved in this appeal contain a business risk exclusion.

[8]First State argues that its policy excludes coverage for personal injuries arising out of the product. However, its argument in the appellate brief does not contain all the applicable policy language. We reject First State's argument because a reading of the entire exclusionary clause demonstrates that the bodily injuries alleged herein are not excluded.

259, 264-65, 371 N.W.2d 392, 394-95 (Ct. App. 1985). In applying similar policy language, our supreme court held:

> The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property *other than to the product* or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. *This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability, for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.*

*Id.* at 264-65, 371 N.W.2d at 394 (quoting Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 Neb. L. Rev. 415, 441 (1971)) (emphasis in original).

Nonetheless, the occupants argue that because the repairs to the home are necessary for health reasons, recovery of the cost of such repair is not barred, citing *Kraemer Bros. v. United States Fire Ins. Co.,* 89 Wis. 2d 555, 278 N.W.2d 857 (1979); *Lawver v. Boling,* 71 Wis. 2d 408, 238 N.W.2d 514 (1976); and *Benke v. Mukwonago-Vernon Mut. Ins. Co.,* 110 Wis. 2d 356, 329 N.W.2d 243 (Ct. App. 1982).

These cases do not support the occupants' contention. In *Kraemer,* the general contractor sued its insurer for damages caused by the collapse of a retaining wall

erected by its subcontractor, a concrete company. The policy excluded damage due to "faulty materials, improper workmanship or installation, errors in design or specifications." *Id.* at 561, 278 N.W.2d at 859. The insurer submitted an affidavit that Kraemer had made a claim against the subcontractor, a concrete company, asserting that the retaining wall collapsed due to the concrete company's "faulty materials, improper workmanship and errors in design." *Id.* at 568, 278 N.W.2d at 863.

Our supreme court ruled that the insurer's affidavit was insufficient to establish a prima facie defense that the concrete company's errors were the sole cause of the collapse. There was also a complaint filed by Kraemer in a separate action in federal court stating a claim against another subcontractor for the negligent act of digging a trench and piling dirt, which allegedly was a substantial cause of the wall collapse. The *Kraemer* court concluded: "If it is proved that an excluded peril is not the *sole cause* of the collapse, [United States] Fire is liable under the policy." *Id.* at 570, 278 N.W.2d at 863 (emphasis supplied). It accordingly denied summary judgment to the insurer.

Thus, *Kraemer* is factually distinct. Here, the only asserted cause of the occupants' losses is excessive moisture arising out of Tri-State's product and work. The occupants' contention that the losses were caused by more than one risk is erroneous. The undisputed facts demonstrate that here, one risk caused two different kinds of losses, that is, property damage and bodily injury. The policies specifically exclude coverage for property damage to Tri-State's product. Thus, although bodily injuries are covered under the policies, damage to the products, the Tri-State homes, is not.

*Lawver* and *Benke* are equally unhelpful to the occupants' contention. *Lawver* held that substantial factual issues existed as to whether the plaintiffs' injuries resulted from the use of a truck, an excluded risk, or the construction of the rigging, an included risk, thus precluding summary judgment for the insurer. *Id.* at 422–23, 238 N.W.2d at 521–22. *Benke* involved the collapse of a roof, and the issue was whether it was caused by wind, an included risk, or snow, which was an excluded risk. *Id.* at 359–60, 329 N.W.2d at 245. As in *Kraemer,* these cases involved disputes as to the cause of the losses. In this case, however, the only alleged cause is excessive moisture resulting from defective workmanship. *Kraemer, Lawver* and *Benke* therefore are inapplicable.

The occupants also cite three federal cases for the proposition that the costs of repairs are consequential damages due to bodily injuries and are recoverable. These cases discuss personal injury damages in a general way, *see Duty v. United States,* 735 F.2d 1012 (6th Cir. 1984), and *Denaux v. United States,* 572 F. Supp. 659 (D. S.C. 1983), and permit the cost of the remodeling of a home to accommodate a disabled individual, *see Barnes v. United States,* 516 F. Supp. 1376 (W.D. Pa. 1981). These cases do not, however, involve the interpretation of an insurance contract's exclusionary clause.

Accordingly, we agree with the trial court's assessment that to accept the occupants' position would confuse the term "risk" with the term "loss." In absence of any authority suggesting that the exclusionary clause is inapplicable when the costs of repairs are made necessary due to bodily injuries, we decline to so hold. This holding does not exclude all consequential damages resulting from bodily injuries, as the occupants suggest, but rather limits them to those other than the repair of

81

the home. Neither does it exclude damage to other personalty, such as furniture.

## C. Malpractice/Professional Service Exclusion

The occupants next challenge the trial court's interpretation of the malpractice/professional service exclusion. The Fidelity and Casualty Company of New York's policy contains a "malpractice and professional service" exclusion. Under this exclusion, there is no coverage if the claimed bodily injury and property damage are "due to the rendering of or failure to render any professional service." First State's policy contains a similar exclusion.[9] The trial court concluded that because Tri-State designed as well as manufactured the prefabricated home, it was engaged in a professional service. The trial court ruled that the professional service exclusions would bar the occupants' claims.

The insurers argue that the trial court properly interpreted the professional service exclusion because the designing of a home involves specialized knowledge and skill, which is predominantly a mental and intellectual exercise, rather than a physical or manual one. The term "professional services" is "commonly defined as acts or services involving specialized knowledge, labor or skill which is predominantly mental or intellectual rather than physical or manual." *Shelley v. Moir,* 138 Wis. 2d 218, 223 n.2, 405 N.W.2d 737, 739 n.2 (Ct. App. 1987).

The insurers assert that because the defective design gave rise to the claims, the claims are barred by the exclusion. They reason that the court should focus on the nature of the act rather than the title of the

---

[9]The language of the policies is sufficiently similar that this discussion applies equally to both.

person performing the act, relying on *Bank of California v. Opie,* 63 F.2d 977, 981 (9th Cir. 1981), *cited with approval in Shelley,* 138 Wis. 2d at 223 n.2, 405 N.W.2d at 739 n.2. The insurers further argue that numerous cases hold that the work performed by an architect or engineer is a professional service.[10] They also contend that the term "professional service" has a much broader meaning than used in the past, and therefore should encompass the design services associated with production of the homes.

We conclude that the professional service exclusion does not bar the occupants' claims because the claims arise out of manufacture of an allegedly defective product and not malpractice in rendering of a professional service. *Rupp v. O'Connor,* 81 Wis. 2d 436, 439–41, 261 N.W.2d 815, 816–17 (1978), dealt with the concept of professional services in the context of a statute of limitations defense. However, its reasoning is equally applicable to the term as it is used in the insurance policies.

*Rupp* distinguished between a contract for professional services and a contract for the end product of the services, holding that the two-year statute of limitations for personal services was inapplicable to a contract to remodel an apartment because the contract was for a remodeled apartment, not for services.

---

[10]*See Horn v. Burns & Roe,* 536 F.2d 251 (8th Cir. 1976); *First Ins. Co. v. Continental Cas. Co.,* 466 F.2d 807 (9th Cir. 1972); *Kirkham, Michael & Assocs. v. Travelers Indem. Co.,* 361 F. Supp. 189 (S.D. 1973), *aff'd,* 493 F.2d 475 (8th Cir. 1974); *United States Fid. & Guar. Co. v. Continental Cas. Co.,* 505 N.E.2d 1072 (Ill. App. 1987); *Womack v. Travelers Ins. Co.,* 251 So. 2d 463 (La. App. 1971); *Witherspoon v. Sides Const. Co.,* 362 N.W.2d 35 (Neb. 1985); *Atlantic Mut. Ins. Co. v. Continental Nat'l Amer. Ins. Co.,* 302 A.2d 177 (N.J. 1973).

> "Such human labor must be in the nature of a service as distinguished from the end-product or the fruit of the service. While some personal services may result in a salable article or an end-product, the distinguishing feature of personal services for the purpose of this section is whether the human labor itself is sought and is the object of the compensation or whether the end-product of the service is purchased."

*Id.* at 440, 261 N.W.2d at 816 (quoting *In re Javornik*, 35 Wis. 2d 741, 749, 151 N.W.2d 721, 725 (1967)).

Here, the occupants sought not merely the design of a home but rather the prefabricated home itself. Tri-State's services were used in the production of a commodity. Most, if not all, human activity involves some intellectual component. However, to break down Tri-State's activities into separate components, and then bar claims arising out of its manufactured product because intellectual skills were employed would go beyond the normal rules of contract interpretation. *See Natural Gas Pipeline Co. v. Odom Offshore Surveys, Inc.*, 889 F.2d 633 (5th Cir. Dec. 6, 1989) (surveying activities are professional services, and to segregate employees' actions would violate plain language of the policy).

We agree with our supreme court's reasoning in *Rupp* that the proper focus should be on the "end-product," not each step in the process that leads to the end product. The cases relied upon by Fidelity can be distinguished because the primary objective of the insured's activity does not result in a product or a commodity.[11]

---

[11]For example *see Waste Management, Inc. v. Wisconsin Solid Waste Recy. Auth.*, 84 Wis. 2d 462, 267 N.W.2d 659 (1978) (development of detailed plans and specifications for solid waste recovery; the construction and operation of system requires scientific knowledge and professional services); *L.L. v. Medical Protective Co.*, 122 Wis. 2d 455, 362 N.W.2d 174 (Ct. App. 1984) (psy-

Although the term "professional services" has a broad meaning, as evidenced in the cited cases, to accept a definition that includes the manufacture of a prefabricated home obliterates its meaning entirely.

Contrary to Fidelity's arguments, our conclusion is not that nothing constitutes a professional service if it results at some point in the production of a commodity. For example, an architectural design may ultimately result in the production of a building, but when one employs an architect, one is purchasing a professional service, not a building.

■

The undisputed facts established that the claims here arose primarily out of the constructed homes, and the occupants' use of the homes. Although the homes' design allegedly contributed to the claimed injuries, the primary objective of Tri-State's operations was the production of a prefabricated home, not a design of a home. Accordingly, the malpractice professional service exclusion does not apply.

D. Claim Against PFS

Next, the occupants challenge the trial court's ruling that the record fails to support a negligence claim against PFS. The trial court granted PFS summary judgment, ruling that its duties were defined by its contractual relationship with Tri-State and no breach of con-

chiatrist's performance of sexual acts with patient); *see also American Fellowship Mut. Ins. Co. v. INA,* 282 N.W.2d 425 (Mich. App. 1979) (adjusting services performed by insurance company; *Knorr v. Commercial Cas. Ins. Co.,* 90 A.2d 387 (Pa. 1952) (injury sustained by beauty parlor patron); *Multnomah County v. Oregon Auto. Ins. Co.,* 470 P.2d 147 (Or. 1970) (failure to administer insulin to jail inmate).

tract was shown. The trial court further held that the record failed to demonstrate that PFS assumed a duty beyond that which was contractually imposed. We conclude that the record raises a factual dispute regarding the scope of PFS's duties to the Tri-State buyers.

The occupants allege that PFS not only contracted with Tri-State to inspect the homes for code violations, but also assumed a duty to ensure that homes built by Tri-State conformed to certain industry standards and generally recognized building practices. "The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others . . .." *A.E. Investment Corp. v. Link Bldrs.*, 62 Wis. 2d 479, 483, 214 N.W.2d 764, 766 (1974); *see also* Restatement 2d Torts sec. 324A (1965).

In support of their allegations, the occupants rely on a memo, dated June 5, 1974, on PFS stationery, and signed by Executive Vice-President Ed Starostovic, P.E.:

TO WHOM IT MAY CONCERN:
This is to inform you that PFS has been retained by Tri-State Homes of Mercer, Wisconsin, for the purpose of establishing and auditing a Quality Control Program and to perform inspections of their production of closed panels and wet cores for their factory built system.

PFS is a not for profit independent inspection and testing agency operating nation wide. All Quality Assurance activities are monitored by a Quality Assurance Council to insure technical adequacy, independence of judgment, and consumer protection.

This memo could create the inference that PFS's duties extended beyond those outlined in its contract with Tri-State to inspect for code compliance. The

record is not clear that this memo was distributed to Tri-State buyers or relied upon by the occupants. However, the memo is sufficient to raise a factual issue whether PFS's duties were solely defined by the contract. One reasonable inference is that the letter, addressed "TO WHOM IT MAY CONCERN," was used to solicit buyers and as a guarantee of the homes' quality. When the evidence permits more than one reasonable inference, summary judgment is not appropriate. *Lawver,* 71 Wis. 2d at 413–14, 238 N.W.2d at 517. Accordingly, the portion of summary judgment dismissing claims against PFS is reversed.

E. Economic Losses

We need not address the occupants' challenge to the trial court's dismissal of tort claims for solely economic losses. The trial court ruled that a claim for solely economic damages does not exist in tort between a seller and purchaser of an allegedly defective product and dismissed solely economic claims against the insurers relying on *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.,* 148 Wis. 2d 910, 437 N.W.2d 213 (1989). However, because purely economic losses arising out of a defective product are already barred by the business risk exclusion, we need not address issues raised by *Sunnyslope.*

III. ISSUES RAISED ON CROSS-APPEAL

Five of the insurers cross-appeal. The issues on cross-appeal are whether the trial court erroneously determined that: (1) disputed issues of fact preclude the application of the statutes of limitations to bar recovery; (2) Wisconsin's borrowing statute does not apply to foreign periods of repose; (3) joinder of the occupants'

claims was appropriate; (4) the pollution exclusion clause does not apply; and, (5) the professional service exclusion contained in Chicago's policy does not apply. We reject these challenges and affirm the trial court with respect to these issues.

## A. Statutes of Limitation

The insurers argue that the absence of a factual dispute regarding the occupants' discovery of their injuries requires the entry of summary judgment.[12] However, the record does not disclose when each of the occupants became aware of the connection between the high moisture levels of their homes and their alleged injuries.[13] Although the record shows that many of the occupants may have known of property damage as early as the mid-1970's, this information is not sufficient to establish the time that they became aware of personal injuries and their connection with the high moisture levels in the homes.

The trial court ruled that the issue of when each individual cause of action accrued, based on when discovery occurred or reasonably should have occurred, is a factual issue that cannot be answered by the trial court

---

[12]The applicable statutes of limitations are: Sec. 541.051(1), Minn. Stats. (1988); sec. 600.5805, Mich. Stats; and sec. 893.89, Wis. Stats. The parties agree that the Michigan and Minnesota residents' claims are governed by the statute of limitations of their respective states. *See* sec. 893.07, Stats.; *see also Guertin v. Harbour Assur. Co.,* 141 Wis. 2d 622, 415 N.W.2d 831 (1987).

[13]This discussion deals only with the damages arising out of bodily injuries because of our previous ruling on the business risk exclusion, which disposes of damages to the home. Also, the record is not clear whether the occupants claimed damage to property other than the product itself, or when such damage may have occurred.

on summary judgment. Our de novo review of the record compels the same conclusion.

■

For the purposes of a statute of limitation, a cause of action accrues when information is available to the claimant of the nature of the injury, the cause of the injury and the defendant's role in the claim. *Borello v. United States Oil Co.,* 130 Wis. 2d 397, 415, 388 N.W.2d 140, 147 (1986). This "discovery rule" applies in Wisconsin. It is not contended that a discovery rule does not apply in Michigan and Minnesota.[14]

The record fails to establish, as a matter of law, that the claims are time-barred. The affidavit of Jeffrey Fuge,[15] asserted that the Larsons were Minnesota plaintiffs claiming personal injuries but having discovered their claims before February 27, 1986, their recovery was barred by Minnesota's two-year limitation period. For example, James Larson's interrogatory reports that he began experiencing chronic coughs, constant drainage in the back of his throat and a stuffy nose in 1985. Patty Larson reported that as early as the fall of 1984 she had earaches, infections, wheezing and shortness of breath. However, a statement of the Larsons, attached to Fuge's affidavit, states: "We never correlated our health problems and the structural problems until we went to the first meeting held in Ashland, WI in *July 1986* and

---

[14]Because the insurers do not challenge the trial court's interpretation of Michigan and Minnesota statutes of limitation, as governed by a "discovery" rule, we do not address this issue on appeal.

[15]In support of their arguments on appeal concerning the statutes of limitation, the insurers relied upon Fuge's affidavit, who is a paralegal in the law firm representing Donald Mears. Fuge compiled discovery answers and medical records excerpts in an attempt to establish the statute of limitation defense.

reading newspaper articles of health related problems of other Tri-State homeowners." (emphasis supplied). The exhibit also discusses the health problems of the Larsons' children. It further states: "It was also very nerve racking to have to stay up many nights with the children, trying to comfort them and try to [relieve] discomforts and not knowing what the cause was."

Fuge's affidavit also states that Michael and Karen Henderson were Minnesota plaintiffs claiming personal injuries and discovering their claim before February 27, 1986. The affidavit states that Karen's medical records indicate that her physician indicated her sinus congestion and headaches might be related to the conditions in her home as early as November 22, 1977. However, a review of the medical record, attached to the affidavit, does not demonstrate that the problems were caused by excessive humidity. To the contrary, a copy of the medical note dated November 22, 1977, was attached to Fuge's affidavit: "On further questioning it sounds like their house might be *a little lacking in humidity* and she was advised to use alot [sic] of humidity. If symptoms continue she was advised to see an allergist." These examples are similar to other interrogatories and show that the record simply does not establish, as an uncontested fact, that the occupants discovered the causes of their bodily injuries or illnesses before applicable statutory limitation periods expired.

B. Statute of Repose

The insurers contend that Minnesota's statute of repose, sec. 541.051(1)(a), Minn. Stats., applies by virtue of Wisconsin's borrowing statute, sec. 893.07, Stats. Minnesota's repose statute provides that no action aris-

ing out of a defective condition of an improvement to real property may be brought more than ten years after substantial completion of construction. Section 541.051(1)(a), Minn. Stats. (1988).[16] Wisconsin's borrowing statute provides: "If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies has expired, no action may be maintained in this state." Section 893.07(1), Stats.

This issue is one of statutory interpretation to be decided without deference to the trial court. *See Richards v. Cullen,* 150 Wis. 2d 935, 939, 442 N.W.2d 574, 576 (Ct. App. 1989). At the outset, we note that the insurers contend that there exists no distinction between the terms "repose" and "limitation." This is not the case. "[I]n Wisconsin, limitations are not treated as statutes of repose." *Maryland Casualty Co. v. Beleznay,* 245 Wis. 390, 393, 14 N.W.2d 177, 179 (1944).

This question was recently addressed in *Beard v. J.I. Case Co.,* 823 F.2d 1095 (7th Cir. 1987). Although the federal court of appeals' decision interpreting Wisconsin law is not binding on this court, it nonetheless remains persuasive authority. The seventh circuit was called upon to answer a question very similar to the one presented here. A Tennessee farmer was injured in Tennessee and brought a products liability action in Wisconsin district court against a Wisconsin manufacturer. The Tennessee statute of repose barred any products liability

---

[16]In addition, sec. 541.051(2), Minn. Stats. (1988) provides:

Notwithstanding the provisions of subdivision 1, in the case of an action which accrues during the ninth or tenth year after substantial completion of the construction, an action to recover damages may be brought within two years after the date on which the action accrued, but in no event may an action be brought more than 12 years after substantial completion of the construction.

action not brought within ten years "from the date on which the product was first purchased." *Id.* at 1097.[17]

The seventh circuit explained the difference between a period of limitation and a period of repose:

> A period of limitation bars an action if the plaintiff does not file suit within a set period of time from the date on which the cause of action accrued. In contrast, a period of repose bars a suit a fixed number of years after an action by the defendant (such as manufacturing a product), even if this period ends before the plaintiff suffers any injury.

*Id.* at n.1.

After concluding that Tennessee law included a period of repose, the seventh circuit determined that Wisconsin's borrowing statute did not mandate the use of a foreign period of repose. In so doing, the court relied upon a series of cases concerning this state's Real Estate Improvement Statute, sec. 893.155, Stats. (1973) (amended and recodified at sec. 893.89).[18] *See Beard,* 823 F.2d at 1101. The statute contained a period of repose: No action may be maintained against certain classes of defendants "more than 6 years after the performance or furnishing of such services and construction." *See Beard,* 823 F.2d at 1101.[19] These cases demonstrated Wisconsin's concern with the remedy for wrongs

---

[17]Tennessee law also provided a six-year statute of limitations barring a products liability action not brought within six years of the injury. *Beard,* 823 F.2d at 1097. The corn picker was purchased in 1950. Beard's accident occurred on November 9, 1981; six months later Beard filed suit.

[18]*See United States Fire Ins. Co. v. E.D. Wesely Co.,* 105 Wis. 2d 305, 313 N.W.2d 833 (1982); *Kallas Millwork Corp. v. Square D Co.,* 66 Wis. 2d 382, 225 N.W.2d 454 (1975); *Rosenthal v. Kurtz,* 62 Wis. 2d 1, 213 N.W.2d 741 (1974).

[19]*See* Wis. Const., art. I, sec. 9, which guarantees "Every

provision, and "its willingness to construe a Wisconsin statute to avoid any possible conflict with that provision." *Id.*

Although the Wisconsin Supreme Court held unconstitutional sec. 893.155, Stats. (1973), on equal protection grounds, *see Kallas Millwork,* 66 Wis. 2d at 383–84, 225 N.W.2d at 455, the court consistently acknowledged "grave constitutional concerns," *Wesley,* 105 Wis. 2d at 312, 313 N.W.2d at 837, with the statute which would "bar[ ] the right to sue before it arises." *Beard,* 823 F.2d at 1101 (citation omitted).

We conclude that the plain language of sec. 893.07, Stats., refers to a period of limitation, not a period of repose, and, even if, as the insurers suggest, the distinction between the two terms is sufficiently blurred as to result in an ambiguity, we agree with the rationale expressed in *Beard:* The Wisconsin Supreme Court has chosen a route of statutory construction that avoids potential constitutional impediments.[20] It is, however, unnecessary to address the remedy for wrongs constitutional argument because we conclude sec. 893.07's plain language compels our result. *Cf. Marshall-Wisconsin Co. v. Juneau Square Corp.,* 139 Wis. 2d 112, 133, 406 N.W.2d 764, 772 (1987) (court must first resort to statutory language).

person is entitled to a certain remedy in the laws for all injuries or wrongs . . .."

[20]The seventh circuit did not decide whether the application of a foreign period of repose violates the Wisconsin Constitution. *Beard,* 823 F.2d at 1101 n.6. It addressed only whether the borrowing statute requires the use of foreign periods of repose.

## C. Joinder of Claims

Next, the insurers contend that the occupants' claims do not satisfy the requirements for permissive joinder. They contend that the claims do not arise out of the same transactions or series of transactions and lack significant common questions of law or fact. They also assert that joinder would permit the occupants to create false impressions and benefit from what they characterize as the extreme prejudice caused by the cumulative effects of all of the occupants' claims.

We review a joinder of claims in order to determine whether the trial court properly exercised its discretion. *See St. Paul Fire & Marine Ins. Co. v. Burchard,* 25 Wis. 2d 288, 298, 130 N.W.2d 866, 871 (1964). "The term 'discretion' contemplates a process of reasoning which depends on facts that are in the record or reasonably derived by inference from the record and yields a conclusion based on logic and founded on proper legal standards." *Mullen v. Coolong,* 153 Wis. 2d 401, 406, 451 N.W.2d 412, 414 (1990).

Here, the trial court properly exercised its discretion. Section 803.04, Stats., permits joinder of claims arising out of the same transaction involving common questions of law or fact.[21] A plaintiff or defendant need

---

[21]Section 803.04(1) provides:

Permissive joinder. All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or

not be interested in obtaining or defending against all the reliefs demanded. The trial court noted that in spite of significant dissimilarities among the various claims, the claims arose out of the same transactions and involve common questions of law and fact. The basis of the claims was the allegedly defective design and construction of the homes and the resulting moisture-related problems. The trial court also noted the potential for prejudice caused by the number of the claims. However, it concluded that the potential prejudice was outweighed by other considerations.

The trial court agreed with the reasons addressed in *Hohlbein v. Heritage Mut. Ins. Co.*, 106 F.R.D. 73, 79 (E.D. 1985):

> Finally, the Court feels strongly that any burden imposed upon the defendant in the consolidated trial of each of the plaintiffs' causes of action is far outweighed by the practical benefits likely to accrue to all players in the conservation of judicial, prosecutorial, and defensive resources. Likewise, the Court is unable to conclude, at this stage in the proceedings, that the specter of jury confusion is sufficiently ominous to justify wholesale severance of this matter into four, discrete lawsuits. As the case proceeds toward trial, the Court may find it appropriate to enter such pretrial orders as necessary to ensure that the several claims of the plaintiffs are presented to the jury in the clearest and most even-handed manner possible; to the extent that the Court shares with the parties this interest in developing unobscure

---

fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

and transparent trial record, it will surely enlist the assistance of counsel in identifying the litigable issues and sharpening the presentation of their respective positions.

■

As in *Hohlbein,* the trial court recognized the potential risks but concluded that the risks could be managed as the trial progressed. The court noted that the appropriate remedy for misjoinder is severance and that in the event the need for severance became apparent as the case developed, it was possible for individual claims or whole groups of claims to be severed from each other. This was a reasonable exercise of trial court discretion.

D. The Pollution Exclusion Clause

Chicago Insurance and Home Insurance argue that the trial court erroneously concluded that the pollution exclusion clause did not apply to the airborne contaminants resulting from the moisture problems in the Tri-State homes. The Home Insurance policy exclusion states:

> This insurance does not apply:
>
> f. to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.

Chicago's policy contains a similar exclusion. The insurers argue that this language is broad enough to include the home environment and the mold, moisture, release of

fungus and mildew. It is argued that: "As long as the tortfeasor's negligence was a substantial factor in and proximate cause of the pollution (i.e., in this case, the release of molds, spores and airborne irritants) . . . [t]he causal connection between the tortfeasor and the resulting pollution should be sufficient." It is further argued that whether it be creating a home that allows water vapor to be trapped, thus producing airborne contaminants through a rotting process or whether the home initially emits airborne contaminants, the exclusion applies.

The trial court ruled that the alleged cause of the bodily injuries and property damage was water vapor trapped in the walls, which in turn caused the growth of microorganisms. No contaminants were released, but rather formed over time as a result of environmental conditions. The trial court concluded that the insurance companies' stance runs contrary to the plain meaning and intent of the policies.

We agree with the trial court's determination that the pollution exclusion clause does not apply. In addition, in *Just v. Land Reclamation Ltd.,* 155 Wis. 2d 737, 456 N.W.2d 570 (1990), our supreme court interpreted identical policy language. It concluded that the meaning of the phrase "sudden and accidental" means unexpected and unintended. *Id.* at 9. It is undisputed that the growth of the molds, fungus, mildew, etc., were unexpected and unintended. Based on the *Just* decision, the exclusion is inapplicable.

E. Chicago's Cross-Appeal of the Trial Court's Ruling that the Professional Service Exclusion Did Not Apply

The trial court ruled that Chicago's professional service exclusion did not apply because Tri-State was not an engineer or an architect. Chicago argues that the exclusion does apply because Tri-State was acting in such a capacity. The exclusion reads:

> Architects, engineers, or surveyors, professional liability exclusion. In consideration of the premium charged, it is agreed that the insurance afforded by this policy shall not apply with respect to liability arising out of the rendering of or the failure to render professional services by or on behalf of the insured, for others, in the insured's capacity as an architect, engineer, or surveyor, including but not limited to any negligent act, error, omission, or mistake involving the preparation of surveys, maps, plans, designs, or specifications, or supervisory inspection or engineering services furnished in connection therewith.

Our previous discussion of the professional service exclusion renders elaborate explanations unnecessary. Our conclusion that the production of a prefabricated home is not a professional service is equally applicable here. Thus, we affirm the trial court's ruling that Chicago's professional service exclusion does not apply.

## IV. CONCLUSION

In summary, we reverse the trial court's ruling that Tri-State did not provide timely notice of an occurrence covered under the policies. We conclude that the record fails to reveal, as a matter of law, when Tri-State became aware of bodily injuries caused by excessive moisture. Thus, there is an issue of material fact as to when Tri-State's duty to report arose. We also conclude that the business risk exclusion bars coverage for the cost of

repairs to the homes themselves, even when such repair is required for health reasons. Bodily injuries and other consequential damages are covered.

In addition, the professional service exclusion and the pollution exclusion clauses do not apply. There is no issue as to the recovery of purely economic losses because the business risk exclusion precludes such recovery against the insurers. Factual issues concerning PFS's liability remain to be resolved. Also, we conclude that the record does not permit rulings, as a matter of law, as to the effect of the applicable statutes of limitations on the individual claims. And, finally, the trial court properly permitted joinder of claims.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded. No costs on appeal.