Kevin CHAPMAN, a Minor, by his next friend and Legal Guardian, Cindy CHAPMAN, Cindy and Leonard Chapman, and Family Health Plan, Plaintiffs,

v.

MUTUAL SERVICE CASUALTY INSURANCE COMPANY, Ralph Green Realtors, Inc., Richard Gurda d/b/a Gurdaco Income Property and Painting Company, ABC Insurance Company, Defendants.

No. 94–C–812.

United States District Court, E.D. Wisconsin.

Jan. 28, 1999.

Timothy Cesar, Hausmann–McNally, Milwaukee, WI, for plaintiff Kevin Chapman and Family Health Plan.

Emile H. Banks, Kasdorf, Lewis & Swietlik, Milwaukee, WI, W. Ted Tornehl, Borgelt, Powell, Peterson and Frauen, Milwaukee, WI, for defendant Ralph Green Realtors and Mutual Casualty Ins. Co.

Steven J. Snedeker, Hills and Hicks, Brookfield, WI, Mutual Service Casualty Ins. Co.

Richard Gurda, Franklin, WI, pro se.

Attorney James T. Murray Jr., Attorney Molly C. Feldbruegge, Peterson, Johnson & Murray, Milwaukee, WI, for defendant Laverne E. Mathea and Grace Oldenburg.

Thomas E. Dolan, Dolan Law Offices, Milwaukee, WI, for 3rd Party Defendant James E. Wilkes d/b/a Wilkes Realty.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiffs Leonard and Cindy Chapman and their son Kevin sued numerous defendants for committing various tortious acts in connection with the faulty inspection and negligent repainting of their home. Plaintiffs claim that Kevin suffers the effects of lead toxicity caused by the presence of lead-based paint in the house purchased by his parents.

Rulings on several dispositive motions have left the following parties as defendants: Richard Gurda; James Wilkes; Ralph Green Realtors, Inc. (RGR); and Mutual Service Casualty Insurance Company (Mutual). This order addresses Mutual's motions to withdraw or amend its discovery responses and for declaratory judgment respecting insurance coverage.

### I. FACTUAL BACKGROUND

On July 21, 1991, the Chapmans signed an offer to purchase the residential property located at 2165 S. 31st Street, Milwaukee.

RGR, through its sales representative Milton Erdman, had prepared and listed the home for sale on behalf of the seller, Grace Oldenburg. The Chapmans' offer was contingent on the plaintiffs obtaining an FHA First Mortgage Loan Commitment. The loan process required an inspection by a government-approved appraiser trained in, among other things, lead-based paint abatement standards.

The Chapman home was inspected by James Wilkes, an HUD-approved appraiser. Wilkes performed his appraisal on August 5, 1991, and completed the required appraisal form and "Attachment A," describing necessary repairs. Attachment A included the following instructions with respect to lead-based paint on the garage and home exterior: "Remove all chipped or pealing [sic] paint, repaint as needed." (Dentice Aff.Ex. D.)

After receiving Attachment A, RGR made arrangements to have the Chapman home repainted. RGR suggested Richard Gurda to do the exterior painting, and the Chapmans offered to paint the interior themselves. RGR contacted Gurda about repainting the house, obtained his estimate, secured Oldenburg's approval, and ultimately gave Gurda directions on how to proceed. On October 9, 1991, after Gurda had completed his work, Wilkes reinspected the house and found that it satisfied HUD requirements, allowing the Chapmans to secure their loan. The closing took place two days later.

The Chapman family moved into the house in late October 1991. Kevin, who was then about 4½, soon began to experience increased lead levels, allegedly from consuming paint chips or inhaling paint dust around the Chapman home. Kevin's blood was tested for lead toxicity in early December 1991 and on a monthly basis thereafter. According to the Chapmans, his lead levels continued to rise steadily, peaking in July 1992.

The Chapmans' allege that the lead paint on the exterior of their home was not properly removed by Gurda or noted by Wilkes at the reinspection. With respect to RGR, plaintiffs allege numerous acts of negligence, including but not limited to

their hiring, supervising and inspecting the work of the paint contractors, Richard Gurda and/or Gurdaco, and the inspector; their failure to warn and/or notify the Chapmans of lead based paint and its hazards; their failure to diligently investigate the material fact of lead base paint; their failure to meet the appropriate standards of care; their failure to comply with Wisconsin Administrative Code Regulations and Licensing, Sec. 24.07, and other acts of negligence and breaches of their warranties and covenants of good faith and fair dealing.

(Fourth Am.Compl. ¶ 24.)

The parties agree that during this allegedly negligent conduct, a businessowner's policy issued to RGR by Mutual was in effect. Plaintiffs' original complaint was filed on July 21, 1994. Pursuant to the businessowner's policy, Mutual undertook a defense of RGR on the merits. Over the next several years, amended pleadings were filed and discovery ensued.

On October 18, 1996, Mutual/RGR responded to plaintiffs' request for admissions and interrogatories. Plaintiffs asked Mutual/RGR to admit that the policy covered the "errors and omissions" of RGR and its agents, as alleged by plaintiffs. Mutual/RGR responded in the following manner:

Mutual Service Casualty Insurance Company denies that the policy issued to Ralph Green Realty [sic], Inc. covers the "errors and omissions" of [RGR agents], but *generally admits that the policy does cover the allegations as pled* in the Complaint and Amended Complaints of the plaintiffs as against Ralph Green Realty [sic], Inc.

(Bischmann Aff.Ex. A. (emphasis added).)

On April 1, 1997, plaintiffs filed their Fourth Amended Complaint. On June 4, 1997, after filing an answer to the amended pleadings, Mutual notified RGR that, although it would continue to defend RGR on the merits, the insurer would now be proceeding under a reservation of its right to contest coverage. Thus, RGR first received word that its policy may not provide coverage for liability based on plaintiffs' claims almost *three years* after the initial complaint was filed naming the realtor as a defendant.

Mutual has moved for relief from its admissions so as to contest coverage, and for a declaratory judgment on whether the policy covers the allegations as pled. Not surprisingly, both plaintiffs and RGR contest these motions. Among other things, plaintiffs argue that they will be unfairly prejudiced by a withdrawal of coverage at this point in the case, and RGR argues that Mutual has waived the right to deny coverage and should be estopped from amending its discovery responses. While some of these arguments may be persuasive, I do not address them here because I find that the policy in question *does* provide coverage for liability based on plaintiffs' claims against the realtor.

## II. POLICY LANGUAGE AND APPLICABLE LEGAL STANDARD

The businessowner's liability coverage policy issued to RGR contained the following professional services exclusion, on which Mutual bases its legal argument for denying coverage:

This insurance does not apply to:

. . .

j. "Bodily injury," "property damage," "personal injury" or "advertising injury" due to rendering or failure to render any professional service. This includes but is not limited to:

(1) Legal, accounting or advertising services;

(2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

(3) Supervisory, inspection or engineering services;

(4) Medical, surgical, dental, x-ray or nursing services or treatment;

(5) Any health service or treatment;

(6) Any cosmetic or tonsorial service or treatment;

(7) Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

(8) Ear piercing services; and

(9) Services in the practice of pharmacy, but this exclusion does not apply to an insured whose operations include that of a retail druggist or drugstore.

(Snedeker Aff.Ex. A at 2, 4.)

■ Wisconsin cases make clear that ambiguities in insurance contracts are to be construed in favor of coverage. *Cardinal v. Leader Nat'l Ins. Co.*, 166 Wis.2d 375, 382, 480 N.W.2d 1 (1992) (citing cases). Exclusion clauses, in particular, are to be narrowly construed against the insurer, especially if they are uncertain as to effect. *Id.* The rationale is, of course, that insurers have an opportunity to be clear about limitations on liability when drafting insurance contracts; they should not be permitted to escape liability through language "dulled by ambiguity." *Meiser v. Aetna Casualty & Surety Co.*, 8 Wis.2d 233, 238, 98 N.W.2d 919 (1959). Ambiguities are therefore resolved in accordance with the principle that it is not important what the insurer may have arguably "intended," but what "a reasonable person in the position of the insured would have understood them to mean." *Ehlers v. Colonial Penn Ins. Co.*, 81 Wis.2d 64, 74–75, 259 N.W.2d 718 (1977).

## III. DISCUSSION

■ Mutual argues that the professional services exclusion in the policy unambiguously excludes coverage for injuries resulting from the type of negligent acts RGR is alleged to have committed. The negligence occurred as part of RGR's services in listing the Chapman home for sale, according to Mutual. These services, the insurer argues, "included document preparation, advertising and marketing" and "require[d] the specialized skills and abilities of a licensed broker." (Mutual's Reply Br. at 10.)

But whether the sum of a real estate agent's activities may be described as "professional" is not the issue for the purpose of liability coverage. The question is whether the acts complained of—which allegedly caused injury to plaintiffs—were of a professional nature. Based on plaintiffs' complaint and my familiarity with the record in this case, the Chapmans allege: that RGR did

not exercise reasonable care in selecting Gurda; that RGR miscommunicated necessary instructions to Gurda and entirely failed to supervise his work; and that RGR failed to investigate the continued presence of lead-based paint and to apprise plaintiffs of abatement efforts. Mutual does not identify which type of professional service, as enumerated in the policy language, these negligent acts consist of. The court will assume, as do plaintiffs and RGR, that Mutual finds the following description applicable: "(3) Supervisory, inspection or engineering services." (Snedeker Aff.Ex. A at 4.)

In support of its interpretation of the professional services exclusion, Mutual relies primarily on two Wisconsin cases: *Shelley v. Moir*, 138 Wis.2d 218, 405 N.W.2d 737 (Ct. App.1987); and *Leverence v. United States Fidelity & Guar.*, 158 Wis.2d 64, 462 N.W.2d 218 (Ct.App.1990). The cases do not support Mutual's argument.

*Shelley* involved the construction of an insurance policy issued to a property management corporation. The question was whether the policy covered bodily injuries resulting from failure to properly maintain a stairwell. *Shelley* at 220–21, 405 N.W.2d 737. The court found that the policy unambiguously excluded claims arising out of bodily injuries and, on that basis, dismissed the claim for damages. *Id.* at 223–25, 405 N.W.2d 737. A professional services exclusion was not at issue in *Shelley*, and the relevant policy language expressly provided coverage for any "error and omission in professional activities as a REAL ESTATE AGENT OR BROKER, rendered or that should have been rendered by the Insured." *Id.* at 222–23, 405 N.W.2d 737. In a footnote, however, the court commented:

> Repair and maintenance of property might not normally be considered "professional services," commonly defined as acts or services involving specialized knowledge, labor or skill which is predominantly mental or intellectual rather than physical or manual. Since, however, the insurance contract defines professional activities to include "property management" without further qualification, ... we assume for the purposes of this opinion that the policy

may cover at least some potential losses arising out of the insured's maintenance and repair activities under a property management contract.

*Id.* at 223 n. 2, 405 N.W.2d 737.

Mutual completely mischaracterizes the holding in *Shelley*, which had nothing to do with a professional services exclusion. In fact, the *Shelley* footnote stands as the best indication that Wisconsin courts would not, in the absence of express policy language to that effect, consider as "professional services" typical real estate agent activities such as property management. The Chapmans' claims do not specifically allege failure to properly maintain and repair the home prior to sale. But to the extent that the claims can be cast as failures in property management, *Shelley* clearly indicates that such services are not ordinarily considered "professional" in Wisconsin.

The central interpretive question in *Leverence*, as in *Shelley*, is inapposite to the present case. Although a professional services exclusion *was* at issue in *Leverence*, the issue was whether the policy excluded coverage for injuries caused by a defectively manufactured product—in that case, prefabricated homes which retained excessive moisture, causing an ongoing health risk. *Leverence*, 158 Wis.2d at 72, 462 N.W.2d 218. The insured both designed and manufactured the defective homes. The insurer argued that the claims were premised on faulty design, and therefore coverage was barred by the professional services exclusion "because the designing of a home involves specialized knowledge or skill." *Id.* at 82, 462 N.W.2d 218. But the court concluded, relying on a distinction drawn from *Rupp v. O'Connor*, 81 Wis.2d 436, 439–41, 261 N.W.2d 815 (1978), that the claims arose out of the defective product itself, not the faulty design process. *Leverence* at 83, 462 N.W.2d 218. Therefore, liability coverage for the claims was not barred by the professional services exclusion. The *Rupp* distinction was between services in which "human labor itself is sought and is the object of compensation" and those in which "the end-product of the service is purchased." *Rupp* at 440, 261 N.W.2d 815.

Based on *Leverence*, Mutual suggests that professional services exclusions bar coverage

for all claims based on services in which the object of compensation is human labor rather than a product. This is a startlingly broad reading of *Leverence*. *Rupp* and *Leverence* merely suggest that defective product claims cannot be recast by insurers as defective design claims in order to take advantage of liability exclusions for professional services. The cases do not suggest in any way that *all* non-product related services are "professional"; and, indeed, such a contention would conflict with the presumptively narrow construction of exclusion clauses. *Leverence*, then, also does not provide a framework relevant to this case.

The only directly relevant Wisconsin precedent is the *Shelley* court's implicit approval of a definition of "professional services" in that footnote: "[A]cts or services involving specialized knowledge, labor or skill which is predominantly mental or intellectual rather than physical or manual." *Shelley* at 223 n. 2, 405 N.W.2d 737. This definition is consistent with the way the term is generally defined in cases interpreting actual professional services liability exclusions. *See also Gerol v. Arena*, 127 Wis.2d 1, 13 n. 7, 377 N.W.2d 618 (Ct.App.1985) (reproducing jury instruction defining "professional services," given at trial).

Based on this definition, plaintiffs' allegations and the relevant policy language, I do not find that the professional services exclusion in RGR's businessowner's policy unambiguously excludes coverage. *At best*, the effect of the exclusion on these facts is ambiguous, in which case it should be narrowly construed against the insurer. *Cardinal*, 166 Wis.2d at 382, 480 N.W.2d 1. More likely, the exclusion does not apply, and the policy provides coverage.

The actions which RGR is accused of performing negligently do not require "specialized knowledge, labor or skill" of an intellectual nature. Selecting a housepainter, conveying instructions to a housepainter, visually checking to make sure basic painting procedures are complied with—these are not highly specialized or intellectual tasks. Similarly, warning plaintiffs about the presence of lead-based paint and the success of abatement procedures is not highly skilled labor. Mutual's only plausible argument,

based on the policy language, is that RGR is accused of failing to "supervise" Gurda and "inspect" his work. The exclusion bars coverage for "Supervisory, inspection or engineering services." However, consistent with the great weight of persuasive authority from other jurisdictions, I agree that the supervision or inspection required of RGR was not "professional" in the sense of the exclusion. The realtor's duty of care here simply did not involve the exercise of advanced knowledge or training. *See GRE Ins. Group v. Metropolitan Boston Hous. Partnership, Inc.*, 61 F.3d 79, 84–85 (1st Cir.1995) (finding that housing authority's failure to visually check for lead-based paint was not a "professional" inspection).

■ Moreover, even if the services generally provided by real estate brokers are considered "professional" in nature, the mere fact that RGR agents were acting within the scope of employment when the alleged negligence occurred is not dispositive. The acts themselves must use or apply special knowledge or training to qualify as professional services. *See Visiting Nurse Ass'n of Greater Philadelphia v. St. Paul Fire & Marine Ins. Co.*, 65 F.3d 1097, 1101 (3d Cir.1995) ("The relevant consideration is not the title or character of the party performing the act but the act itself.") Further, the complained of acts must be an integral part of the profession, or acts "that distinguish a particular occupation from other occupations." *See Medical Records Assoc., Inc. v. American Empire Surplus Lines Ins. Co.*, 142 F.3d 512, 515 (1st Cir.1998) (finding that fee-setting and sending out bills are not inherent functions in the field of medical records, but ordinary business activities, and therefore not professional services). RGR's alleged neglect was not of this particularized nature.

Finally, if the professional services exclusion were not limited in this manner, it could preclude virtually all coverage under this policy, since the insurance expressly applies to "[p]ersonal injury caused by an offense arising out of [the insured's] business." (Snedeker Aff.Ex. A at 1.) As Wisconsin courts have noted, a policy provision is illusory if it defines coverage so that, in practice, it will never be triggered. *Allstate Ins. Co. v. Gifford*, 178 Wis.2d 341, 349, 504 N.W.2d 370 (Ct.App.1993). Mutual's construction of the

professional services exclusion is illusory in this sense.

For the foregoing reasons, I find that the professional services exclusion in RGR's businessowner's policy does not exclude coverage for potential liability based on plaintiff's claims against the realtor.

**THEREFORE, IT IS ORDERED,** pursuant to Rule 57 of the Federal Rules of Civil Procedure, that Mutual Service Casualty Insurance Company owes a defense and a duty of indemnity to Ralph Green Realtors, Inc., for the claims alleged by plaintiffs.

**IT IS FURTHER ORDERED** that Mutual Service Casualty Insurance Company's motion to withdraw or amend its discovery responses is **DENIED AS MOOT.**

**FINALLY, IT IS ORDERED** that a status conference for remaining parties will be held on *Tuesday, February 9, 1999 at 1:30 p.m.* The conference will be held in Room 204 of the federal courthouse at 517 E. Wisconsin Ave., Milwaukee, Wisconsin.  If you will be unavailable at this time, please contact my chambers as soon as possible.